## UNION BROKERAGE CO. *v.* JENSEN ET AL.

No. 291.  Argued February 1, 1944.—Decided May 8, 1944.

*Mr. Leonard Eriksson* for petitioner.

*Mr. Ordner T. Bundlie* for respondents.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

This is a suit brought in one of the lower courts of Minnesota by the Union Brokerage Company against Jensen and Rime for breach of fiduciary obligations in relation to Union's business, that of customhouse brokerage. The only defense to the suit with which we are concerned is the alleged disability of Union to resort to Minnesota's courts for want of compliance with her laws governing the transaction of business in the State as a foreign corporation. Minn. L. 1935, c. 200, Minn. Stat. 1941, c. 303. The Supreme Court of Minnesota sustained this defense, reversed the judgment in favor of the peti-

tioner, and ordered the suit dismissed. 215 Minn. 207, 9 N. W. 2d 721. We brought the case here to determine the important question whether enforcement of the Minnesota Foreign Corporation Act in this situation runs counter to federal law pertaining to customhouse brokers or is barred by the Commerce Clause. 320 U. S. 724.

Another claim that state authority must yield to controlling federal authority over interstate and foreign commerce is thus presented. It becomes necessary therefore to ascertain precisely what demand the State has here made, in relation to what transactions or activity it is making such demand, in what way federal authority has regulated such transactions or activity, and, finally, whether the Commerce Clause by its own force, in case federal law has not actually taken control, excludes the State from the exercise of the power it has here asserted.

For many years the petitioner, a North Dakota corporation, conducted a customhouse brokerage business at Portal, North Dakota, a port of entry from Canada by way of the Canadian Pacific Railway. In July, 1940, the Canadian Pacific re-routed most of its shipments whereby they no longer entered the United States through Portal but came through Noyes, Minnesota, with the result that more than 90% of Union's business was diverted from Portal. After November, 1940, at which time respondent Jensen resigned as officer of Union under circumstances giving rise to this suit, Union began to do business at Noyes and was doing business in Minnesota when it brought this suit. We shall outline the nature of this customhouse brokerage business only so far as is relevant to a consideration of our problem.

On goods shipped from Canada into this country the consignee of imported merchandise must "make entry" of

them at the office of the collector of customs at Noyes either in person or by an authorized agent, and this must be done within forty-eight hours of the report of the vehicle which carried the goods unless the collector extends the time. Tariff Act of 1930, 46 Stat. 590, 722, 52 Stat. 1083, 19 U. S. C. § 1484 (a). To make entry, the contents and value of the shipment must be declared and the tariff estimated, and the production of a certified invoice and a bill of lading is generally required. 19 U. S. C. § 1484 (b) (c) (e) (g). Speed in making entry is vital, because goods cannot proceed to their ultimate destination until its completion. Apart from the fact that importers cannot always or even often make entries in person, the procedure makes demands upon skill and experience. The specialist in these services is the customhouse broker. In addition, he advances the duty in order that the goods may be cleared. 19 U. S. C. § 1505. The competence of the broker also bears on the efficient collection of customs duties in that the likelihood of additional assessment or refund after final determination of the duty is greatly lessened by accuracy in the tentative computation. But since errors and differences of opinion are inevitable, to insure collection of deficiencies the Government requires a bond prior to release. 19 U. S. C. § 1499; 19 Code Fed. Reg. § 6.27.

The business of customhouse brokers, it is apparent, demands a sense of responsibility and skill. To protect importers as well as the Treasury, Congress has authorized the Secretary of the Treasury to "prescribe rules and regulations governing the licensing as customhouse brokers of citizens of the United States of good moral character, and of corporations, associations, and partnerships, and may require as a condition to the granting of any license, the showing of such facts as he may deem advisable as to the qualifications of the applicant to render valuable serv-

ice to importers and exporters." 46 Stat. 759, 19 U. S. C. § 1641 (a). Elaborate regulations define the investigation to be made of the character and reputation of the applicant and his experience in customs matters. 31A Code Fed. Reg. § 11.3 (b). The applicant is then directed to appear before an examining subcommittee which determines the "applicant's knowledge of customs law and procedure and his fitness to render valuable service to importers and exporters." 31A Code Fed. Reg. § 11.3 (e) (f). On approval of a favorable report of the subcommittee by the Committee on Enrollment and Disbarment of the Treasury Department, a license issues. 31A Code Fed. Reg. §§ 11.3 (f) (g), 11.4. "A licensed customhouse broker requires no further enrollment under the regulations in this part for the transaction, within the customs districts in which he is licensed, of any business relating specifically to the importation or exportation of merchandise under customs or internal-revenue laws." 31A Code Fed. Reg. § 11.5.

Union's license authorizes it to do business in District No. 34 which embraces both Portal, North Dakota, and Noyes, Minnesota. 19 Code Fed. Reg. § 1.2. The regulations require it to keep records of its financial transactions as customhouse broker, and its books and papers must be kept on file available for at least five years. 31A Code Fed. Reg. § 11.8. Business relations with those who have been denied a license because of moral turpitude or those whose license has been revoked are prohibited, and the licensee is under a duty not to promote evasion of obligations to the Government. Prompt payment and accounting of funds due to the Government or his client are required of the broker, and responsible and ethical conduct is generally enjoined. 31A Code Fed. Reg. § 11.9.

Does this scheme of federal regulation of the business of customhouse brokers preclude the requirement of Minne-

sota legislation which the Supreme Court of that State has enforced against Union? This brings us to a consideration of the precise demand against which Union protests. Minnesota has not singled out the customhouse brokerage business for legislation nor has she made requirements of foreign corporations doing customhouse brokerage business. What is in controversy is the applicability of a general law of Minnesota dealing with all foreign corporations. More specifically, § 20 of the Minnesota Foreign Corporation Act requires a certificate of any foreign corporation doing business in the State as a prerequisite for maintaining an action in a court of that State. In addition a filing fee of five dollars and initial license fee of fifty dollars is exacted on making application for a certificate of authority. §§ 21 (a) (1), 6. Such an application must contain the name of the corporation, its home state or country, the address of its principal office and that of its proposed registered office in Minnesota, the names and addresses of its directors and officers, a statement of its aggregate number of authorized shares and kindred information. § 5. The applicant must furthermore consent to the service of process upon it and appoint an agent upon whom service can be made, and in lieu of such appointment or if the agent cannot be found, service may be made upon the Secretary of State. §§ 5 (6), 13 (a) (2). A foreign corporation doing business in Minnesota without a certificate of authority is subject to a penalty not exceeding $1,000 and "an additional penalty not exceeding $100.00 for each month or fraction thereof during which it shall continue to transact business in this state without a certificate of authority therefor." § 20 (c). Having obtained such a certificate, the corporation is required to file annual reports on the basis of which an annual fee is assessed. The measure of the fee is substantially the same as that set for domestic corporations but in its computation the property

and gross receipts of a foreign corporation are allocated between those derived from within and those derived from without Minnesota and credit is given for the latter. § 15; cf. Minn. L. 1935, c. 230, § 2.

We have before us only one narrow aspect of this Minnesota legislation, namely the power of Minnesota to deny to Union access to its courts because it has not obtained a certificate required of all foreign corporations doing business in the State. We have not before us the taxing power of Minnesota over such a business as that of Union, for we do not know the extent or nature of the power to tax that Minnesota would claim against Union.

Of course Minnesota could not deny access to its courts to Union merely because it is engaged in the customs brokerage business. See *Second Employers' Liability Cases,* 223 U. S. 1, and *Douglas* v. *New York, N. H. & H. R. Co.,* 279 U. S. 377. But the limited and defined control which federal authority has thus far seen fit to assert over customhouse brokers does not deny to Minnesota the power to subject Union to the same demand which it makes of all other foreign corporations seeking the facilities of Minnesota's courts. The federal requirements and this state requirement can move freely within the orbits of their respective purposes without impinging upon one another. The federal regulations are concerned solely with the relations of the customhouse broker to the United States and to the importer and exporter. The limited federal supervision of the financial activities of Union is restricted to these federal interests. Such supervision does not touch the interest of the State in the protection of those who have other dealings with Union, and therefore does not preempt appropriate means for their protection.

In a situation like the present, where an enterprise touches different and not common interests between Na-

tion and State, our task is that of harmonizing these interests without sacrificing either. The proper attitude of mind for making such an accommodation is illustrated by *Federal Compress Co.* v. *McLean,* 291 U. S. 17. The Tariff Act of 1930 in this case, as the Warehousing Act in that case, confers upon licensees certain privileges, and secures to the Federal Government by means of these licensing provisions a measure of control over those engaged in the customhouse brokerage business. But such circumscribed control by the Federal Government does not imply immunity from control by the State within the sphere of its special interests. "The government exercises that control in the furtherance of a governmental purpose to secure fair and uniform business practices. But the appellant, in the enjoyment of the privilege, is engaged in its own behalf, not the government's, in the conduct of a private business for profit." *Federal Compress Co.* v. *McLean, supra* at 22–23. The state and federal regulations here applicable have their separate spheres of operation. The Federal Government has dealt with the manner in which customhouse brokerage is carried on. Minnesota, however, is legitimately concerned with safeguarding the interests of its own people in business dealings with corporations not of its own chartering but who do business within its borders. Union's business is localized in Minnesota, it buys materials and services from people in that State, it enters into business relationships, as this case, a suit against its former president, illustrates, wholly outside of the arrangements it makes with importers or exporters. To safeguard responsibility in all such dealings, dealings quite outside transactions immediately connected with import and export, Minnesota has made the same exactions of Union as of every other foreign corporation engaged in similar transactions. The Federal Government has recognized that there is such a

proper field for state regulation complementary to federal regulation, for the Treasury has provided that "a licensee having a license in force in one district may on application to the Committee be granted a license to transact business in another district without further examination, provided it appears on investigation that the licensee is authorized to do business in the State or States in which such other district is situated." 31A Code Fed. Reg. § 11.6. Those who are responsible for protecting the interests of the revenue as well as of commerce have thus given emphatic indication that a State has a legitimate interest in the regulation of those engaged in the brokerage business within its borders. Where the Government has provided for collaboration the courts should not find conflict. See *Savage* v. *Jones,* 225 U. S. 501, and *Kelly* v. *Washington,* 302 U. S. 1.

This brings us to the final question. Does the Minnesota legislation do that which the Commerce Clause was designed to prevent—does it express hostility toward those engaged in foreign commerce or practically obstruct its conduct? What we have said makes it abundantly clear that the business of Union is related to the process of foreign commerce. As the trial court found, the customhouse broker in clearing the shipments, "aids in the collection of customs duties and facilitates the free flow of commerce between a foreign country and the United States." The fees exacted by customhouse brokers "are charges upon the commerce itself"; they are charges for services afforded in the movement of goods beyond the boundaries of a State. See *Hopkins* v. *United States,* 171 U. S. 578, 591–2; *Wickard* v. *Filburn,* 317 U. S. 111, 122.

But the Commerce Clause does not cut the States off from all legislative relation to foreign and interstate commerce. *South Carolina Highway Dept.* v. *Barnwell Bros.,*

303 U. S. 177; *Western Live Stock* v. *Bureau,* 303 U. S. 250. Such commerce interpenetrates the States, and no undisputed generality about the freedom of commerce from state encroachment can delimit in advance the interacting areas of state and national power when Congress has not by legislation foreclosed state action. The incidence of the particular state enactment must determine whether it has transgressed the power left to the States to protect their special state interests although it is related to a phase of a more extensive commercial process.

The information here sought of all foreign corporations by Minnesota as a basis for granting them certificates to do business within her borders is a conventional means of assuring responsibility and fair dealing on the part of foreign corporations coming into a State. Apart from any question of interference with foreign commerce such a requirement is plainly within the regulatory power of a State. But, as we have noted, while the business of Union is that of a customhouse broker, its activities are not confined to its services at the port of entry. It has localized its business, and to function effectively it must have a wide variety of dealings with the people in the community. The same considerations that justify the particular regulatory measure alone before us, namely the requirement of a certificate of authority in the case of foreign corporations carrying on business other than customhouse brokerage, apply to the carrying on of Union's business in Minnesota. The burden, such as it is, falls on foreign businesses that commingle with Minnesota people, and the burden, a fee of fifty dollars, is sufficiently small fairly to represent the cost of governmental supervision of foreign business enterprises coming into Minnesota. In short, it is a supervisory and not a fiscal measure. As such it imposes costs upon the State which

those who are supervised must, as is often the case, themselves pay. See *Clyde Mallory Lines* v. *Alabama,* 296 U. S. 261, 267.

We have considered literally scores of cases in which the States have exerted authority over foreign corporations and in doing so have dealt with aspects of interstate and foreign commerce. Whatever may be the generalities to which these cases gave utterance and about which there has been, on the whole, relatively little disagreement, the fate of state legislation in these cases has not been determined by these generalities but by the weight of the circumstances and the practical and experienced judgment in applying these generalities to the particular instances. To review them to any extent would be writing the history of the adjudicatory process in relation to the Commerce Clause. Suffice it to say that we have not here a case of a foreign corporation merely coming into Minnesota to contribute to or to conclude a unitary interstate transaction, see *International Textbook Co.* v. *Pigg,* 217 U. S. 91; *Dahnke-Walker Co.* v. *Bondurant,* 257 U. S. 282, nor of the State's withholding "the right to sue even in a single instance until the corporation renders itself amenable to suit in all the courts of the State by whosoever chooses to sue it there." *Sioux Remedy Co.* v. *Cope,* 235 U. S. 197, 205. The business of Union, we have seen, is localized in Minnesota, and Minnesota, in the requirement before us, merely seeks to regularize its conduct. Nor is there here an attempt to tax property or gross receipts earned outside the State, as was the case in *Looney* v. *Crane Co.,* 245 U. S. 178. In the absence of applicable federal regulation, a State may impose non-discriminatory regulations on those engaged in foreign commerce "for the purpose of insuring the public safety and convenience; . . . a license fee no larger in amount than is reasonably

required to defray the expense of administering the regulations may be demanded." *Sprout* v. *South Bend,* 277 U. S. 163, 169.

The Commerce Clause does not deprive Minnesota of the power to protect the special interest that has been brought into play by Union's localized pursuit of its share in the comprehensive process of foreign commerce. To deny the States the power to protect such special interests when Congress has not seen fit to exert its own legislative power would be to give an immunity to detached aspects of commerce unrelated to the objectives of the Commerce Clause. By its own force that Clause does not imply relief to those engaged in interstate or foreign commerce from the duty of paying an appropriate share for the maintenance of the various state governments. Nor does it preclude a State from giving needful protection to its citizens in the course of their contacts with businesses conducted by outsiders when the legislation by which this is accomplished is general in its scope, is not aimed at interstate or foreign commerce, and involves merely burdens incident to effective administration. And so we conclude that in denying Union the right to go to her courts because Union did not obtain a certificate to carry on its business as required by the Foreign Corporation Act, Minnesota offended neither federal legislation nor the Commerce Clause.

*Judgment affirmed.*

Mr. Justice Jackson and Mr. Justice Rutledge dissent.