In re BELL LUMBER CO.

MODERN HOUSING MFG. CO. v. CARTIER et al.

Nos. 8637, 8638.

Circuit Court of Appeals, Seventh Circuit.

June 8, 1945.

J. Robert Kaftan, of Green Bay, Wis., for appellant.

E. L. Everson, of Green Bay, Wis., Walter A. Rice, of South Bend, Ind., and George E. Bills and Alex Wilmer, both of Green Bay, Wis., for appellees.

Before SPARKS, KERNER, and MINTON, Circuit Judges.

SPARKS, Circuit Judge.

On December 22, 1943, Bell Lumber Company, a Wisconsin corporation, filed its petition for reorganization under Chapter 10 of the Bankruptcy Act, 11 U.S.C.A. § 526. The District Court approved the petition and appointed trustees who, on order of that court, took custody and control of the debtor's assets.

By leave of court, Modern Housing Company, a Maryland corporation, hereafter referred to as Modern Housing, was permitted to intervene and file its petition to recover from the debtor, hereafter referred to as Bell, certain moneys in the hands of the trustees in which plaintiff claimed a proprietary interest by virtue of a written contract between Modern Housing and Bell dated June 8, 1942. The court held that the contract relied upon was void for non-compliance with the Wisconsin statute requiring licensing of foreign corporations doing business in that state, and dismissed the petition.

The contract recites that it is a memorandum of an agreement between Modern Housing, of Washington, D. C., and Bell Lumber Company, of Green Bay, Wisconsin; that the parties have had understandings from time to time concerning their rights and interests in a joint enterprise concerning the obtaining and execution of contracts for housing and other construction; that it is a stipulation to consolidate such agreements in the light of present developments, and shall represent a replacement and amendment in full substitution of all previous understandings on the topics covered by the contract.

In substance it provides that Modern Housing shall furnish Bell the former's "Pre-Fabrication and Plant Service," which includes plans and designs of houses and other buildings and their appurtenances, as well as operational methods incident to the Shultz Process of streamlined factory production and assembly line methods, which is under exclusive lease to Modern Housing; that such service includes all shop drawings, details covering the necessary jig and pattern layouts, shop floor plan, all shop and time controls necessary to production, and supervision by a qualified housing engineer supplied by Modern Housing, fully acquainted with all incidents to the prosecution of the Shultz Process, who will train Bell's personnel in the technique of its prosecution. All plans furnished, or developments or improvements thereon, are to remain the property of Modern Housing.

Bell agreed to employ the service of Modern Housing on such contracts as the latter might secure for Bell, and in consideration of such service Bell agreed to pay Modern Housing an amount equal to two percent of the face of such contracts, when payments thereon were received by Bell.

Bell further agreed to pay from the proceeds of such contracts all expenses in connection with the setting up of plant facilities for the construction of houses, and all other expenses incident to the carrying out of any housing contracts secured.

Upon securing each housing contract, Bell was to advance to Modern Housing $680 to provide for the expense incident to the installation of its services, and was to pay the salary and expenses of the supervisor for such time as it might require them. Such advances were to be deducted from the amount due Modern Housing under the two percent clause above referred to.

In the event that any contract was cancelled, any advances covered by the $680 above referred to were to be classed as liquidated damages, and Bell was to pay Modern Housing only on such buildings as had been manufactured and delivered.

Both parties agreed to use their best efforts to contribute to the preparation and submission of all proposals, data, and plans incident to the securing of contracts and they agreed to cooperate fully in all matters that might lead to the successful conclusion of such business.

The agreement was to terminate on ninety days notice by either party, and if

at that time a contract had been secured, then such termination was to become final upon the completion of such contract, until which time the terms of the agreement should remain in full force and effect. Upon such termination all plans furnished by Modern Housing, or developments or improvements thereon were to be returned to Modern Housing.

Modern Housing signed the contract by Samuel M. Shultz, its vice-president and general manager, which positions Shultz has held at all times since. Bell signed the contract by its president and secretary. It was drawn by Modern Housing's attorney, and was the only contract Modern Housing had with Bell. The former had no contract with any of Bell's customers. Modern Housing agreed to and did secure the customers' contracts for the prefabricated material, and furnished Bell all plans and specifications. However, such contracts were executed only by such customer and Bell, and the materials when fabricated by Bell, in compliance with the specifications, were required by the customers' contracts to be shipped by Bell to the respective customers F. O. B. cars at Green Bay, Wisconsin. After that neither Bell nor Modern Housing was required by any contract to be at the point of destination at any time, except that the contract between Bell and each customer required Bell to have a man in the field for the purpose of checking the material as it arrived in the field. Neither party hereto was required to do anything with respect to the actual erection of the building.

On June 16, 1942, Shultz came to Green Bay where he lived at a hotel until February or March, 1943, and from that time on he made his permanent residence at Green Bay, Wisconsin, until after the hearing of this case on April 17, 1944. At the time this contract was executed, Modern Housing maintained an office in Maryland but discontinued it in September, 1943, and since that time until after the hearing of this cause in the District Court, its only office was in the city of Green Bay.

When Bell entered into this contract, it conducted a retail lumber yard and had no buildings aside from lumber sheds. It was necessary to construct a new building to house the prefabricated housing production line. Shultz and his assistant Swan were experts in this work, and they super-vised the installation of the necessary machinery and equipment which they recommended as being required in such work, and after the installation of such machinery and equipment they supervised the operation of the plant and trained Bell's employees in the technique of operating a prefabricated production line. For such purpose they employed draftsmen and architects, some of them from Green Bay, who there assisted in the preparation of plans and specifications. For such work they also employed stenographers and other casual employees at Green Bay. Shultz, and those thus employed, made shop drawings and templets, at Green Bay, which were used in the setting up of the production line, installed production controls, made studies of time elements, costs, and methods, and schedules of materials to be purchased for use in the prefabrication process. A great number of prefabricated housing units were manufactured by Bell at this plant prior to December 22, 1943, when it filed its petition for reorganization in the bankruptcy court. During all of this time Modern Housing, by its general manager and its various employees, was supervising and participating in such manufacturing process at Green Bay.

At the time these parties entered into their contract, Shultz knew that Bell was a Wisconsin corporation and that the only plant it operated was located at Green Bay, Wisconsin.

Appellees, National Discount Corporation, referred to as National, and Rock Finance Company, made large loans to Bell to carry on such business, and as security therefor National had taken from Bell certain mortgages upon its property and both had received from Bell certain assignments of its customers' contracts for the prefabricated materials. National set forth its claim as preferential to Modern Housing and all other claimants, and asked the court to determine its status as a creditor.

The theory of Modern Housing's petition is that the contract in suit created a joint adventure between it and Bell, and gave the former a proprietary interest of two percent in the proceeds of the prefabricated housing contracts performed by Bell.

The trustees, and the two creditors, National and Rock Finance, deny such claim. They contend (1) that the contract

is void because of the failure of Modern Housing to comply with section 226.02 of the Wisconsin Statutes[1] relating to the licensing of foreign corporations to do business in that state; (2) in the event the contract is held not to be void, it did not create a joint adventure which gave each party thereto a proprietary interest in the proceeds, but that Modern Housing is merely a general creditor; and (3) appellees, National and Rock Finance, contend, if the contract is valid and constitutes a joint adventure, that Modern Housing, by its knowledge and conduct, is estopped as against them from asserting its interest in the proceeds of the contract. After the hearing the District Court held, on May 20, 1944, that the contract was void because of Modern Housing's non-compliance with the cited Wisconsin Statute. On May 25, 1944, the court found for National as a preferred creditor, and ordered the trustees to pay its claim as such. The other issues raised were not determined. From these rulings the appeals are prosecuted

Appellant contends that when it was performing its contract with Bell it was thereby engaged in interstate commerce and was not subject to regulation by the Wisconsin Statute. The only disclosure of this record as to the corporate purposes of Modern Housing is the manufacture of prefabricated housing, and furnishing the engineering service with respect thereto. The contract in no way limited the territory in which Modern Housing should secure customers' contracts for Bell. It so happened, however, that all such contracts were secured from customers living outside Wisconsin, and the buildings were to be erected outside Wisconsin. In construing the contract between Bell and Modern Housing we think it should not be confused with the contracts between Bell and its customers, none of which appear in this record. Modern Housing was not a party to any of those contracts, nor were any of the erecting contractors or the purchasers of the prefabricated materials parties to the contract between Bell and Modern Housing. The latter prepared and secured all the purchasers' contracts with Bell, and it is significant that they were so prepared as to relieve Modern Housing from any liability for Bell's failure to perform its part of the customers' contracts. Shultz' undisputed testimony discloses that Bell's obligation to its customers extended to and included its delivery of the materials properly fabricated F. O. B. cars at Green Bay, Wisconsin. All such obligations were performed by Bell in Wisconsin, and ordinarily this would amount to a complete performance by Bell of its customer's contract. However, Shultz testified, and it is not denied, that the customers' contracts required Bell to have a man in the field at all times to check the prefabricated materials as they arrived, and Bell complied with that provision. This obligation did not rest upon Modern Housing, although the latter inserted it in Bell's contracts with its customers. It seems clear to us that this insertion was made by Modern Housing in order to insure Bell's cooperation in all matters that might lead to the successful conclusion of its business, which it agreed to do under its contract with Modern Housing. Such purpose is emphasized by certain activities of Modern Housing with respect to the erection of the buildings. Shultz testified that Modern Housing sent certain of its employees to the places of erection. They were familiar with the details concerning the erection of such houses, and showed the contractors how to put them together, and gave them whatever instructions they would accept. He said they felt that that would be one way they could get the houses put together properly; that it was not particularly a part of the contract, but it was a good thing to do to avoid a lot of back charging; that

---

[1] 226.02, Wisconsin Revised Statutes

"(1) No foreign corporation shall transact business or acquire, hold, or dispose of property in this state until it shall have filed in the office of the secretary of state a copy of its charter, articles of association or incorporation and all amendments thereto certified by the proper officer of the state wherein the corporation was organized, and shall have been licensed in this state. * * *

"(9) Foreign corporations and the officers and agents thereof doing business in this state shall be subjected to all the liabilities and restrictions that are imposed upon domestic corporations of like character, and shall have no other or greater powers. Every contract made by or on behalf of any such foreign corporations, affecting its liability or relating to property within this state, before it shall have complied with the provisions of this section, shall be void on its behalf and on behalf of its assigns, but shall be enforcible against it or them."

984

Modern Housing made routine inspections on all such jobs, and tried to help the contractor as much as possible because in that way they helped the fabricator.

■ The Wisconsin statute here involved is a declaration of public policy with reference to any foreign corporation transacting business in that state, Wisconsin Trust Co. v. Munday, 168 Wis. 31, 168 N.W. 393, 169 N.W. 612, and its provisions are constitutional. Diamond Glue Co. v. United States Glue Co., 187 U.S. 611, 23 S.Ct. 206, 47 L.Ed. 328.

■ If a foreign corporation is engaged in interstate commerce, and as a mere incident to such commerce, engages in business in Wisconsin, it is not transacting business in Wisconsin so as to subject it to that state's regulations. Greek-American Sponge Co. v. Richardson Drug Co., 124 Wis. 469, 102 N.W. 888, 109 Am.St. Rep. 961.

■ It will be conceded that no state will be permitted to regulate interstate commerce, because that power has been delegated exclusively to Congress by our Federal Constitution. However, it is not every act of a state, with respect to a corporation of another state dealing in interstate commerce within the former's boundaries, that is considered to be a regulation of interstate commerce within the meaning of the Constitution. Each state may exact compliance with reasonable conditions prescribed by it from any outside corporation for permission to carry on the business, authorized by its charter, within such state. See Union Brokerage Co. v. Jensen, 322 U.S. 202, 64 S.Ct. 967, 88 L.Ed. 1227. No state can prevent articles of interstate commerce from traversing or being delivered within its boundaries, nor can it exact compensation therefor, for that would amount to a regulation of such commerce.

Just where is the borderline of reasonable conditions which a state may impose upon an outside corporation doing business within its bounds is a question which early confronted our Supreme Court. In Diamond Glue Co. v. United States Glue Co., 187 U.S. 611, 23 S.Ct. 206, 208, 47 L.Ed. 328, this Wisconsin statute was before the Court. The action was for failure to perform a contract and for resulting damages. The contract involved was one by which it was agreed that plaintiff, an Illinois corporation, should supervise plans for a glue factory to be built by the defendant, a Wisconsin corporation, on a site in Wisconsin; that plaintiff should have the management of the manufacturing in it, and should operate it for defendant; that plaintiff's officers should give the factory all necessary personal supervision with respect to management and operation, and furnish a superintendent for that purpose; that it should control, handle and sell the entire output of the factory and should guarantee payment on all sales made by it, and receive commissions for its services. The defense was that plaintiff had failed to comply with this statute. The court, speaking through Mr. Justice Holmes, held that the contract called for a carrying on of business in Wisconsin by plaintiff at a time when to carry it on without filing a copy of plaintiff's charter was validly forbidden by the laws of that state. True, the superintendence and manufacture of the glue had to come before the sale, while in the instant case the completed fabrication did not occur until after the contract of sale was executed.

In the Diamond case it was urged that the contract in suit, as carried out, was concerned in part with interstate commerce and therefore was free from the operation of the Wisconsin statute. The Court said that the portions of the contract that called for the carrying on of business in Wisconsin were not so concerned, and the inseparable provisions as to selling left it to chance or extrinsic business considerations whether the contemplated traffic should go outside the State; that the foundation of the commerce outside the State was doing business within it, and that the small requirements of the Act before allowing the plaintiff to do business in the State, if good as to that business taken by itself, were not made bad by the presence in the contract of an ulterior term which the plaintiff might or *did intend* to carry out by transporting the products of the business elsewhere. The Court further stated, "The interference with the regulation of commerce between the states is more remote than when a bridge between two states, or the franchise of a domestic corporation created with the intent to carry on such commerce, is taxed. (Citing cases.) In modern societies every part is related so organically to every other, that what affects any portion must be felt more or less by all the rest. Therefore, unless everything is to be forbidden and legisla-

tion is to come to a stop, it is not enough to show that, in the working of a statute, there is some tendency, logically discernible, to interfere with commerce or existing contracts. Practical lines have to be drawn and distinctions of degree must be made." The court held that the Wisconsin statute was a valid enactment and did not interfere with interstate commerce. Cf. Union Brokerage Co. v. Jensen, supra; Crescent Oil Co. v. Mississippi, 257 U.S. 129, 42 S.Ct. 42, 66 L.Ed. 166; Kidd v. Pearson, 128 U.S. 1, 9 S.Ct. 6, 32 L.Ed. 346; Edgewater Realty Co. v. Tennessee Coal, Iron and Railroad Co., D.C., 49 F.Supp. 807; 17 Fletcher's Cyclopedia of Corporations, sections 8417, 8469.

█ From this line of reasoning has stemmed the rule laid down and continuously followed by the Supreme Court for many years, that when a corporation is engaged in interstate commerce in a state other than that of its residence, and as a related part of such engagement there performs acts which are merely incidental to the carrying on of such commerce, such acts will not constitute doing business in that state within the meaning of such a state statute as that of Wisconsin. The converse of this is true. If such acts performed in another state are not merely incidental to the interstate commerce, but are substantial with respect thereto, then it is carrying on business in that state, and is subject to reasonable requirements of the state statute. In the cases where the corporation has been relieved from the effect of such a statute, it was not merely because it was engaged in interstate commerce, but also because the unreasonable requirements of the statute amounted to regulation if interstate commerce, or because the acts complained of were merely incidental to interstate commerce and did not amount to doing business in the state within the meaning of such statute. So far as we know all states have such a statute. They were enacted for the benefit and convenience of the citizenship generally, and the Wisconsin statute bears the distinction of having the approval of the Supreme Court as to its reasonableness.

Plaintiff relies on United States v. Southeastern Underwriters Association, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440; International Textbook Co. v. Pigg, 217 U.S. 91, 30 S.Ct. 481, 54 L.Ed. 678, 27 L.R.A., N.S., 493, 18 Ann.Cas. 1103; and Pfaudler Co. v. Westphal, 190 Wis. 486, 209 N.W.

700. The Underwriters case deals only with what the Court there holds to be unreasonable interference with substantial elements of interstate commerce upon a statement of facts which seem to us not to be comparable to those here presented.

In the Pigg case, plaintiff, a corporation of Pennsylvania, was engaged in teaching by correspondence at Scranton, Pennsylvania. Its executive officers, its teachers and instructors resided and performed their duties there. It had no office in Kansas. However, it had what is termed a solicitor-collector for Kansas who lived there and maintained and paid for his office at Topeka. He solicited and secured students in Kansas for plaintiff, by written contracts, and under such contracts he received money from such students and forwarded it to plaintiff at Scranton. For such services he received from plaintiff a salary and certain commissions. Nothing more was done by or for plaintiff within that state. Pigg was such a student and was sued by plaintiff in Kansas for the unpaid balance due under his contract. Kansas had a statute which exacted from foreign corporations doing business in that state all that the Wisconsin statute exacts, and much more, such as reports as to financial status, organization, capitalization, name and residence of each stockholder and number of shares held and owned by each; name and address of each officer, trustee and director. It also required such outside corporation to pay to the state treasurer of Kansas for the benefit of its permanent school fund a specified percentage of its capital stock. The defendant pleaded plaintiff's non-compliance with this statute as a defense. The Supreme Court, speaking through Justice Harlan, held that plaintiff was engaged in interstate commerce and that the requirements of the statute were unreasonable in that they placed a burden upon interstate commerce which was hostile both to the letter and spirit of the Federal Constitution. That opinion cites Western Union Telegraph Co. v. Kansas, 216 U.S. 1, 30 S.Ct. 190, 54 L.Ed. 355, which was decided at the same term of court as was the Pigg case, and the opinion was written also by Justice Harlan. It held the Kansas statute unconstitutional because of the required deposit in the Permanent School Fund.

The Pfaudler case involved a sale and delivery by a New York corporation to a citizen of Wisconsin of a special type

of intricate mechanical equipment, and of course that was interstate commerce. The seller agreed to install it and did so. The Supreme Court of Wisconsin, following the earlier decisions of our Federal Supreme Court, held that the installation did not amount to doing business in Wisconsin as contemplated by the statute of that state, but was merely incidental to such interstate commerce.

We think there is no inconsistency between the Diamond Glue case and the Pigg case. Justices Holmes and Harlan wrote the respective opinions, and they with Chief Justice Fuller and Justices Brewer, White and McKenna participated in both cases. True, Chief Justice Fuller and Justice McKenna dissented in the Pigg case, without assigning reasons therefor but nowhere in the opinion is any adverse criticism of the decision in the Diamond Glue case expressed or reasonably to be implied.

▪ Appellant contends that it was not doing business in Wisconsin, as contemplated by the Wisconsin statute, and in support of this contention it relies on the Pigg case, supra, and Ford, Bacon & Davis, Inc. v. Terminal Warehouse Co., 207 Wis. 467, 240 N.W. 796, 81 A.L.R. 1127. What we have said about the Pigg case need not be repeated. It is quite clear that the plaintiff in that case was engaged in interstate commerce and that the Kansas statute wrongly attempted to regulate it. If what Pigg did in Kansas was merely incidental to interstate commerce, as plaintiff now contends, then what Modern Housing did outside Wisconsin, was likewise incidental to the interstate commerce, if any, in which Modern Housing claims to have been engaged, for they did precisely the same things, that is to say they solicited and secured customers' contracts for other parties, and Pigg did more, he collected the money and remitted it to his employer.

In the Terminal case, supra, a foreign corporation agreed to investigate business conditions in Milwaukee and then to advise the defendant as to the feasibility of expanding its plant. It sent its agents into Wisconsin merely to make a survey and secure information upon which to make its report. The contract did not affect the title to any property within Wisconsin, nor did it contemplate the construction or creation of any property in that state. While there the agents transacted no business except to secure information upon which to base an opinion, and the Supreme Court of Wisconsin so found, and held that such facts did not constitute the doing of business within that state in violation of its statute. A reading of that opinion is quite convincing of the factual difference between that case and this one, and we think it supports Judge Duffy's ruling in this case.

In the case at bar Modern Housing moved its principal office to Wisconsin, which for most of the time was its only office, hired licensed architects, draftsmen and clerical help in that state and there took an essential part in the manufacture of prefabricated houses, the only things its charter authorized or its contract required it to do, save the securing of Bell's contracts with its customers, which were secured long after Modern Housing had moved its principal office to Wisconsin, and long after it had executed its contract with Bell.

To say that the work done in Wisconsin by Modern Housing was merely incidental to that done by it outside that state is certainly putting that conclusion in reverse from the undisputed evidence. We think the District Court was right in holding that Modern Housing was carrying on its business in Wisconsin in violation of the statute pleaded. That being the case, there was no necessity for that court, nor is there for us, to discuss the other issues raised before both courts as to whether or not Modern Housing had a proprietary interest in the funds of the debtor, and, if so, whether it was estopped from asserting such interest.

Both decrees are

Affirmed.