MEYERS and others, Respondents, vs. MATTHEWS, Commissioner of Banks, Appellant.

*June 3—June 28, 1955.*

454

For the appellant there was a brief by the *Attorney General* and *Roy G. Tulane,* assistant attorney general, and oral argument by *Mr. Tulane.*

For the respondents there was a brief by *Stroud, Stebbins, Wingert & Stroud* of Madison, attorneys, and *Byron H. Stebbins* and *E. L. Wingert* of Madison, and *Barker, Winger, Bagby & Smith* of Kansas City, Missouri, of counsel, and oral argument by *E. L. Wingert* and *Byron H. Stebbins.*

FAIRCHILD, C. J.   Respondents are nonresidents of Wisconsin who propose to work within its borders in the manner outlined in the foregoing statement of facts. They claim to be independent contractors. Their first contention is that they are exempt from the Wisconsin Collection Agency Law by the fact, *per se,* of being engaged in interstate commerce; and that sec. 218.04, Stats., is discriminatory against and places an undue burden upon interstate commerce.

Appellant bank commissioner contends, on the other hand, that such collection-agency statute is a regulatory police measure which the state has authority to impose upon persons working within its borders, and that it places no undue burden upon interstate commerce either by way of prohibitive fees or discriminatory provisions.

The Collection Agency Law was created by ch. 358, Laws of 1937, largely for the purpose of abating the then-existing vices of out-of-state collection agencies, arising out of their use of harsh and deceptive contracts. The records of the banking department show that after passage of that law, none of the then-existing foreign mail-order collection agencies attempted to qualify under the Wisconsin law, and the vices aimed at by the legislature ceased.

It is obvious that an annual license fee of $2 is not a tax, as it barely covers the administrative costs of issuing such license. The same is true of a $50 fee for an agency license. In *Union Brokerage Co. v. Jensen* (1944), 322 U. S. 202,

210, 64 Sup. Ct. 967, 88 L. Ed. 1227, it was held that "the burden, a fee of fifty dollars, is sufficiently small fairly to represent the cost of governmental supervision." Considering the time and work involved in investigating an applicant for a collection-agency license, a fee of $100 cannot be held to be exorbitant or prohibitive. This fee is paid once and once only, unless very extensive investigation is necessary, in which case an additional amount may be required in a particular case. As said in the *Union Brokerage Case, supra,* the test of a reasonable fee is that it shall be no greater than is sufficient to cover the expenses of administration. The bond which the bank commissioner has the power to require under sec. 218.04, Stats., is not a tax, because its proceeds do not inure to the benefit of the state. It is merely a means authorized by the legislature "to safeguard the interests of the public." It is not the license, but the purpose behind it which is important. After requiring a license and fixing fees, the statute in its remaining provisions aims to safeguard the interests of the public and protect it "from oppressive or deceptive practices." The provisions with respect to maintaining a place of business, keeping books and records which shall be open for inspection, and submitting reports are similar to provisions considered in numerous United States supreme court cases which have upheld the right of the state to control persons working within its borders, even though those persons are engaged in interstate commerce. "The information here sought of all foreign corporations by Minnesota as a basis for granting them certificates to do business within her borders is a conventional means of assuring responsibility and fair dealing on the part of foreign corporations coming into a state." *Union Brokerage Co. v. Jensen, supra* (p. 210). As was said in *California v. Thompson* (1941), 313 U. S. 109, 112, 61 Sup. St. 930, 85 L. Ed. 1219, the statute "is not shown to be other than what on its face it appears to be, a measure to safeguard the members of the

public . . . who are peculiarly unable to protect themselves from fraud and overreaching of those engaged in a business notoriously subject to those abuses."

The Wisconsin Collection Agency Law does not impede the flow of interstate commerce by placing upon it an undue burden either as to discriminatory or prohibitive fees or by other discriminatory provisions. The provisions of the statute apply equally to those engaged in intrastate commerce and to those engaged in interstate commerce.

The field of regulation of collection agencies and solicitors for the purpose of protecting the interests of the public has not been pre-empted by congress. In the absence of the barriers of discrimination and undue burden, a state may pass regulatory laws to protect its residents from fraud and unconscionable conduct by out-of-state collection agencies who maintain representatives within the borders of the state. In *California v. Thompson, supra,* it was stated (p. 113) :

"As this court has often had occasion to point out, the commerce clause, in conferring on congress power to regulate commerce, did not wholly withdraw from the states the power to regulate matters of local concern with respect to which congress has not exercised its power, even though the regulation affects interstate commerce. Ever since *Willson v. Black Bird Creek Marsh Co.,* 2 Pet. 245, and *Cooley v. Board of Port Wardens,* 12 How. 299, it has been recognized that there are matters of local concern, the regulation of which unavoidably involves some regulation of interstate commerce, but which because of their local character and their number and diversity may never be adequately dealt with by congress. Because of their local character, also, there is wide scope for local regulation without impairing the uniformity of control of the national commerce in matters of national concern and without materially obstructing the free flow of commerce which were the principal objects sought to be secured by the commerce clause. Notwithstanding the commerce clause, such regulation in the absence of congressional action has, for the most part, been left to the states by the decisions of

this court, subject only to other applicable constitutional restraints."

Speaking along the same line, Mr. Justice FRANKFURTER, in the *Union Brokerage Case, supra*—a case in which the federal government itself required a license to protect its own interests in matters of *national* concern—stated (p. 208):

"The federal government has recognized that there is such a proper field for state regulation complementary to federal regulation, for the treasury has provided that 'a licensee having a [federal] license in force in one district may on application to the committee be granted a license to transact business in another district without further examination, *provided it appears on investigation that the licensee is authorized to do business in the state or states in which such other district is situated.'* . . . Those who are responsible for protecting the interests of the revenue as well as of commerce have thus given emphatic indication that a state has a legitimate interest in the regulation of those engaged in the brokerage business within its borders. Where the government has provided for collaboration the courts should not find conflict." Citing *Savage v. Jones* (1912), 225 U. S. 501, 32 Sup. Ct. 715, 56 L. Ed. 1182, and *Kelly v. Washington* (1937), 302 U. S. 1, 58 Sup. Ct. 87, 82 L. Ed. 3.

It would be possible to quote extensively from other United States supreme court decisions holding to the same effect, but we deem it sufficient to cite, in addition to the above cases: *Robertson v. California* (1946), 328 U. S. 440, 66 Sup. Ct. 1160, 90 L. Ed. 1366; *Hartford Accident & Indemnity Co. v. Illinois* (1936), 298 U. S. 155, 56 Sup. Ct. 685, 80 L. Ed. 1099; *State v. Helwig* (1952), 262 Wis. 299, 54 N. W. (2d) 907, and cases cited in those and the above-referred-to decisions.

It is to be noted that, with the development of the law, in determining questions arising under the constitution as to the spheres in which the police power of the states and federal government are permitted to operate, the courts have been

more and more mindful of the possible disturbance of the mixed and complicated balance of our political system and the dangers of removing a protective authority too far from the locality needing protection. The more recent cases of the United States supreme court have abandoned the rule seemingly imposed by earlier cases, requiring states to maintain a "hands off" policy with respect to attempted state regulation if it even so much as touched interstate commerce. The more recent cases adopt the rule that in the absence of discrimination or undue burden resulting from state regulation, where congress has not already legislated, a state may exact licenses and reasonable fees as well as conformance with provisions designed to assure the responsibility of out-of-state concerns and their integrity in dealing with the residents of the state, even where such concerns are engaged in interstate commerce. A case in point is *Di Santo v. Pennsylvania* (1927), 273 U. S. 34, 47 Sup. Ct. 267, 71 L. Ed. 524, formerly relied on by interstate-commerce businesses in claiming immunity from state regulation, but since overruled with the result that it is no longer controlling authority:

"The decision in the *Di Santo Case* was a departure from this principle which has been recognized since *Cooley v. Board of Port Wardens* [12 How. (U. S.) 299, 12 L. Ed. 996], *supra*. It cannot be reconciled with later decisions of this court which have likewise recognized and applied the principle, and it can no longer be regarded as controlling authority." *California v. Thompson, supra* (p. 116).

In holding as it did in the present case, the trial court apparently followed the now-discarded doctrine of the earlier cases that if a person or corporation was engaged in interstate commerce, that fact of itself rendered such person or corporation immune from state regulation. In its decision it relied heavily upon *Real Silk Hosiery Mills v. Portland* (1925), 268 U. S. 325, 45 Sup. Ct. 525, 69 L. Ed. 982, and *Memphis Steam Laundry Cleaner. Inc., v. Stone* (1952)

342 U. S. 389, 72 Sup. Ct. 424, 96 L. Ed. 436, and cited the so-called "drummer cases." These cases are clearly distinguishable from the present case, because the holding of unconstitutionality of attempted state regulation in such cases was based upon discrimination and undue burden. In the *Real Silk Hosiery Case,* it was not a state statute but a city ordinance which was involved. Manifestly, if every municipality in the state were allowed to exact a license, then the total sum of such licenses could prove so prohibitive as to put an undue burden upon interstate commerce and impede its free flow.

The trial court further advances the theory that if the United States supreme court cases hereinbefore cited in support of our conclusion were not controlling in *Metropolitan Finance Corp. v. Matthews, supra,* they, therefore, cannot be controlling here. That reasoning does not follow. In the *Metropolitan Case, supra,* it was held only that Metropolitan was not doing business in the state of Wisconsin "so long as the solicitors are independent contractors and not subject to the direction of the plaintiff." If Metropolitan was not doing business in Wisconsin under the facts as alleged, of course Wisconsin could not use its police power to regulate the corporation. But even there, it was held by this court that if Metropolitan had been doing business in this state, Wisconsin would have had constitutional authority to exercise its police power under sec. 218.04, Stats., and the court quoted from *United States v. South-Eastern Underwriters Asso.* (1944), 322 U. S. 533, 547, 64 Sup. Ct. 1162, 88 L. Ed. 1440, enunciating principles in support of our conclusion.

The novel contention in the present case is that respondents are independent contractors who procure lists of delinquent accounts, turn them over, or "sell" them, to Metropolitan, and that then they are "through." The implication is that respondents play an outside role apart from the collection-agency business because they have nothing to do with the

collecting of accounts. Such a concept of separation of a collection agency from its solicitors is too unrealistic to be supported by the evidence and is not contemplated by and would render void the Wisconsin law under sec. 218.04, Stats., which has for its purpose the protection of the public interests.

An affidavit submitted by appellant declares that Metropolitan admitted to one of appellant's employees that it (Metropolitan) could not do business without its solicitors. Under the evidence in the present case, the respondents are sufficiently under the direction of Metropolitan to show that their true relationship is one of principal and agent.

When presented with a copy of a sheet entitled "Instructions to Solicitors," Mr. Holman testified:

"It is just more or less to outline the kind of accounts the company would accept and what they will not accept, *and what the solicitor can do and what he can't do.*"

That instruction sheet contains very minute details as to how a solicitor is to work, with whom he may deal or may not deal, what forms he must use, how he must fill them out, what information must be furnished, what accounts may or may not be accepted, restrictions as to what he may tell his client, and when commissions will be withheld and when they will be paid.

In addition to the instruction sheet a "Solicitor's Manual" is published by Metropolitan and issued to its solicitors. This manual assumes all of the important problems which may arise between the solicitor and his client and specifically advises the solicitor how to handle such problems.

Although Mr. Holman testified that he was not restricted or controlled by the corporation as to the area in which he could work, he later admitted that a solicitor could obtain an assignment of an exclusive territory upon condition that he had 200 listings or more. In such a case, then, Metropolitan would be directing not only the details of the work

but also the place of that work both as to the exclusive agent and as to other solicitors who would be forbidden to do business in the excluded territory. Furthermore, Metropolitan reserves the right to accept or reject offers of assignment in its own discretion.

The only control, then, that the solicitor has over his work is as to physical activities, such as time and manner of traveling. Such self-controlled activities are not sufficient to preclude agency.

The inseparable relation between the respondents and Metropolitan is further evident from the manner in which each refers to the other in the conduct of their business transactions. The solicitor's contract form received and used by Mr. Holman in 1949 refers to him, in the upper right-hand corner as "district representative" and at the bottom as "your representative." Even though that reference has lately been changed to read "solicitor," Metropolitan has not changed its method of operating, and the reference in the forms received by Mr. Holman in 1949 is indicative of the true relationship between Metropolitan and its solicitors.

Further, Mr. Holman testified that in introducing himself to a prospective client he used the following language:

"Mr. Smith, this is C. B. Holman speaking, from the Metropolitan Finance Corporation. My firm, Mr. Smith, specializes in the handling of professional accounts, mostly delinquent accounts. We find we are not dealing with you, although we carry a large portion of that business throughout the country. So I called more or less to make you acquainted with our service. . . ."

That is exactly the same form of introduction which solicitors of Metropolitan are told to use in the "Solicitor's Manual" issued to them by the corporation. From the testimony it is noticeable that in talking with his clients Holman identifies himself with the corporation by the use of the terms "we," "our," "my firm," "on behalf of." That the impression made

by the solicitor upon his client is one of identity with the corporation is shown by the wording in a letter from a client, quoted in part as follows:

"I would like to commend the Metropolitan and their representative, Mr. Holman."

An agent is described in Restatement, 1 Agency, p. 10, sec. 1, as:

". . . a person authorized by another to act on his account and under his control. Included within its meaning are both those who, whether or not servants . . . act in business dealings and those who, being servants, perform manual labor. An agent may be one who, to distinguish him from a servant in determining the liability of the principal, is called an independent contractor. Thus, the attorney at law, the broker, the factor, the auctioneer, and other similar persons employed either for a single transaction or for a series of transactions are agents, *although, as to their physical activities, they are independent contractors.*"

Agency may be of a general or special character, and soliciting agents are agents of a special nature. An agent having authority only to solicit applications and forward them to the home office is a "soliciting agent." 39 Words and Phrases (perm. ed.), p. 621; *Rozgis v. Missouri State Life Ins. Co.* (1933), 271 Ill. App. 155, 157. An agency is created by contract, express or implied. "The relation arises when one is authorized to represent another in bringing or to aid in bringing the latter in contractual relation with a third party, however such authority may be conferred." 2 Words and Phrases (perm. ed), p. 725; *Keyser v. Hinkle* (1907), 127 Mo. App. 62, 72, 106 S. W. 98, 100.

In *International Textbook Co. v. Pigg* (1910), 217 U. S. 91, 30 Sup. Ct. 481, 54 L. Ed. 678, it was determined by both the lower court and the United States supreme court that there was no question but that International Textbook Com-

pany was doing business in Kansas through the maintenance of a force of agents in that state.

Metropolitan unquestionably is doing business, and it is doing that business with the aid of its solicitors. Therefore when its solicitors are present in Wisconsin, Metropolitan is present and doing business in Wisconsin. The true relation shown by the evidence to exist between Metropolitan and its solicitors is one of principal and agent. It does not matter for the purposes of this case whether the respondents may be a type of independent contractor or not. We are not concerned here with tort liability or workmen's compensation. What is important here is that the solicitors are agents of Metropolitan.

Under all the evidence, Metropolitan itself is reaching, through its agents, into Wisconsin and dealing with the people of Wisconsin. The respondents' right to engage in the activities of solicitors and to create the incidences connected with doing a collection-agency business stems from the primary licensing of the collection agency.

Under the facts, Metropolitan and its solicitors would be subject to the provisions of sec. 218.04, Stats., and the statute is not under any condemnation arising from restrictions burdening interstate commerce.

This is not a reversal of *Metropolitan Finance Corp. v. Matthews, supra.* The difference between the present case and that case cannot be too strongly emphasized. The determination there that Metropolitan was not doing business in this state is based wholly upon a hypothetical condition regarding the status of its solicitors, who were not present in that case. This court there very carefully pointed out that *"so long as* the solicitors are independent contractors *and not subject to the direction of the corporation,"* the Metropolitan would not be doing business in this state. In the present case we have determined the true status of the solicitors, who are the respondents. We have shown that they are subject to the

direction of the corporation, that they are in fact agents of the corporation; and that it is not important whether or not they are independent contractors from the standpoint of imposing liability upon Metropolitan for their torts.

*By the Court.*—The judgments are reversed, and the causes are remanded with instructions to vacate the judgments and dismiss the complaints.