OSKEY BROTHERS PETROLEUM CORPORATION, Respondent v. GORDER et al., Appellants

(109 N.W.2d 893)

(File Nos. 9857, 9896. Opinion filed June 26, 1961)

**Maynes & Myers**, Aberdeen, for Defendants-Appellants.

**Campbell, Voas & Richardson,** Aberdeen, for Plaintiff-Respondent.

NICHOL, Circuit Judge. Oskey Brothers Petroleum Corporation is a corporation organized and existing under the laws of the State of Minnesota. Defendants J. E. Gorder and R. F. Gorder, d/b/a The Gorder Company, are engaged in the real estate and insurance business at Aberdeen, South Dakota.

This action was instituted by the plaintiff, hereinafter called Oskey, in the Circuit Court of Brown County, South Dakota, against the Gorders to recover the balance due on an open account for petroleum products sold and delivered by Oskey to the defendant J. Herschel Hardy, d/b/a the Pure Joy Oil Company of Aberdeen, South Dakota, which account Oskey claims was guaranteed by the Gorder Company. The case was tried to the Court, a jury having been expressly waived, and judgment for $5,042.69 was entered in favor of the plaintiff and against the Gorder Company, J. E. Gorder, an individual, and J. Herschel Hardy, an individual, d/b/a the Pure Joy Oil Company, defendants.

The contract of guaranty under which Oskey seeks to hold the Gorder Company and J. E. Gorder, an individual,

consists of a letter from the Gorder Company, dated July 10, 1957, which reads as follows:

"I am enclosing, herewith, copy of a list of mortgages which I sent to Loftsgaarden and Loftsgaarden, attorneys at St. Paul.

"In connection with the open account for the purchase of gas and other products sold to the Pure Joy Oil Company, this letter will serve to confirm our conversation that I will be personally responsible for the payment of these accounts from time to time. As I have indicated to you, no checks can be issued without my counter-signature and the money can be used for no other purpose except to meet operating costs, pay for merchandise and liquidate the advances that I have made to Joe Hardy, so I have no hesitancy in guaranteeing these accounts to you.

"It shall be our purpose to pay these accounts promptly and take advantage of the discount as soon as we get to functioning properly. I assure you I shall see to that.

"It was very pleasant to meet and visit with the members of your organization and I am sure that our relationship will be pleasant and profitable for both of us.

"I hope that the matter can be taken care of as expeditiously as possible.

"Very truly yours,

"The Gorder Company
"By: /s/ J. E. Gorder"

The circumstances surrounding the issuance of the foregoing letter are as follows:

On or about June 11, 1957, J. E. Gorder acting as agent for Virginia Burns, then owner of the Pure Joy Oil Com-

pany, a service station located west of Aberdeen, sold the Pure Joy Iil Company station, including inventory and equipment, to J. Herschel Hardy. A bill of sale was executed covering the personal property, and a contract for deed covering the real property, to Hardy. Under the terms of the contract for deed and bill of sale, a $16,000 down payment was required. J. E. Gorder made a loan of this amount to Hardy, who in turn gave Gorder his promissory note for $16,000, secured by an assignment of the contract for deed and bill of sale covering the Pure Joy Oil Company property.

In the latter part of June, 1957, J. E. Gorder and Hardy drove to St. Paul, Minnesota, for a conference with certain employees of Oskey. J. E. Gorder was anxious to get back the $16,000 loan that he had advanced to Hardy, and he and Hardy conferred with one A. F. Berglove, plant sales manager for Oskey, as to the possibility of Oskey's loaning Hardy the $16,000 down payment. No loan was closed at that time, Mr. Berglove testifying on cross-examination that: "Mr. Gorder left the office and we told him that we would give very serious consideration to his proposal."

At the same conversation J. E. Gorder orally guaranteed the open account established between Oskey and Hardy for petroleum products sold by Oskey to Hardy, now doing business as the Pure Joy Oil Company. Gorder's testimony, however, was to the effect that the oral guaranty was on condition that the $16,000 loan would be made by Oskey either to Hardy or to Gorder. This is disputed in the testimony of Mr. Berglove on behalf of Oskey.

Berglove, Oskey's sales manager, testified on cross-examination that their discussion and investigation of the credit of Mr. Hardy indicated that there was nothing which would disclose that he was financially responsible, but that a financial statement was produced on behalf of Mr. Gorder showing him (Gorder) to have a net worth somewhere in excess of $700,000.

Shortly after Gorder and Hardy returned to Aberdeen, and on or about July 9, 1957, Berglove, apparently becoming alarmed about the failure of Hardy to keep up on the open account for petroleum products, called J. E. Gorder and requested that the previous oral guaranty made by Mr. Gorder be reduced to writing. This was done as shown by Exhibit 1, J. E. Gorder's letter of July 10th, reproduced above.

The following day, on July 11, 1957, Oskey's attorneys sent J. E. Gorder certain documents to be signed consisting of chattel mortgage, promissory note for $16,000, and collateral agreement. The note was to be signed by Hardy and guaranteed by J. E. and R. F. Gorder. Before the same were signed, and within a few days after receipt by J.E. Gorder, he received a telephone call from Berglove advising him that "We couldn't make the loan." Shortly thereafter, on or about July 22, 1957, Oskey's attornyes returned to J. E. Gorder various papers relative to the $16,000 loan and requested the return of papers previously forwarded.

Defendant Gorder's two main defenses to the action instituted by Oskey on the guaranty contained in Exhibit 1, the letter of Gorder's dated July 10, 1957, are first, that plaintiff is a foreign corporation which has not complied with the laws of the State of South Dakota relating to foreign corporations, Chap. 11.21, SDC 1939, and second, that the contract of guaranty was conditioned, dependent upon, and subject to Oskey's making a loan of $16,000 to cover the down payment advanced by Gorder to Hardy.

It is admitted that Oskey has never complied with Chapter 11.21, SDC 1939. Counsel for appellant Gorder conceded on oral argument that if transactions between Oskey and Hardy involved interstate commerce, Chap. 11.21, SDC 1939 would not apply. This is in accordance with the well-established rule laid down in Dakota Photo Engraving Co. v. Woodland, 59 S.D. 523, 241 N.W. 510, Lawyers' Co-op. Pub. Co. v. Bauer, 60 S.D. 259, 244 N.W. 327; Sioux Remedy Co. v. Cope, 235 U.S. 197, 35 S.Ct. 57,

59 L.Ed. 193, reversing 28 S.D. 397, 133 N.W. 683; anc Wyman, Partridge Holding Co. v. Lowe, 65 S.D. 139, 27ι N.W. 181.

The principal issue therefore to be decided here, is whether the transactions out of which the guaranty arose constituted transactions in interstate commerce.

The evidence showed that Oskey shipped petroleum products on order of Hardy on eight separate occasions, to-wit: June 13, 1957, June 29, 1957, July 19, 1957, July 13, 1957, July 18, 1957, July 23, 1957, July 31, 1957, anc August 10, 1957. The shipment of products was accom- plished by Hardy's placing his original order witl Oskey, and then Oskey's purchasing the products from the Consumer Co-op, who in turn shipped the petroleun products through pipe line from Coffeyville, Kentucky, to Watertown, South Dakota, where the shipment was then transferred to a transport carrier, (Transport, Inc.), and delivered by gasoline truck to the filling statioι at Aberdeen, South Dakota. Oskey never actually handlec the product physically, but ordered its delivery by in dependent contractors and paid the Consumer Co-op foι the product.

The evidence showed that at no time would there bι a sufficient quantity of gasoline stored at Watertown, South Dakota, to cover the needs of Oskey customers for a period of thirty days.

Appellant's principal argument is that the temporary storage of the petroleum products at Watertown where the method of transportation was changed from pipe line to gasoline transport truck, sufficiently breaks the continuity of movement essential to a finding that the transaction was in interstate commerce.

Appellant cites various decisions of the United States Supreme Court, particularly Atlantic Coast Line R. Co. v. Standard Oil Co., 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270; and General Oil Co. v. Crain, 209 U.S 211, 28 S.Ct. 475, 52 L.Ed. 754, in support of his theory that when products

are unloaded, stored, and mixed with other property in the state, interstate commerce has ended for all purposes. The Atlantic Coast Line case involved the case of a railroad companys' charging freight rates other than intrastate rates. The Crain case involved the power of taxation.

Justice Frankfurter, in the case of Union Brokerage Co. v. Jensen, 322 U.S. 202, 64 S.Ct. 967, 88 L.Ed. 1227, reviews previous decisions of the United States Supreme Court concerning attempts by the states to extend authority over foreign corporations in connection with various aspects of interstate commerce. In this case he refers specifically to Sioux Remedy Co. v. Cope, 235 U.S. 197, 35 S.Ct. 57, 59 L.Ed. 193, and makes the distinction between a foreign corporation conducting a localized business in another state, and the right of a foreign corporation to sue in a single instance without complying with statutes such as South Dakota's Chapter 11.21, SDC 1939.

We fail to find a distinction between the case at bar and the prior decision of this court in Trans-Mississippi Grain Co. v. Spracher, 47 S.D. 262, 197 N.W. 686.

■ Whether a transaction was interstate commerce is dependent upon the interpretation of the Federal Constitution upon which the judicial determination of the Supreme Court of the United States is final. We can find nowhere among the United States Supreme Court decision where the United States Supreme Court has ever repudiated the language employed by Mr. Chief Justice Hughes in Furst v. Brewster, 282 U.S. 493, 51 S.Ct. 295, 296, 75 L.Ed. 478, as follows:

> " 'Importation into one state from another is the indispensable element, the test, of interstate commerce; and every negotiation, contract, trade, and dealing between citizens of different states, which contemplates and causes such importation, whether it be of goods, persons, or information, is a transaction of interstate commerce.' Such commerce comprehends all the component parts of commercial intercourse between different states,

and, according to established principle, any state statute which obstructs or lays a direct burden on the exercise of the privilege of engaging in interstate commerce is void under the commerce clause."

The Eighth Circuit Court of Appeals in Mid-Continent Petroleum Corp. v. Keen, 157 F.2d 310, held that the temporary storage of petroleum products in tanks at a bulk plant was merely a convenient intermediate storage in the process of getting these products from the oil fields to the filling station, and specifically cited the decisions of the United States Supreme Court in Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 335, 87 L.Ed. 460, wherein Mr. Justice Douglas, writing for the court, held that the entry of goods into a warehouse does not terminate their interstate journey, and that a temporary pause in their transit does not mean that they are no longer in commerce. He employs the following language:

"* * * if the halt in the movement of the goods is a convenient intermediate step in the process of getting them to their final destinations, they remain 'in commerce' until they reach those points. Then there is a practical continuity of movement of the goods until they reach the customers for whom they are intended. That is sufficient. Any other test would allow formalities to conceal the continuous nature of the interstate transit which constitutes commerce."

The Supreme Court of Iowa in the case of Credit Industrial Co. v. Happel, Inc., 106 N.W.2d 667, 669, which was a suit on trade acceptances arising out of the purchase of certain materials transported in interstate commerce, held that to prohibit maintenance of an action of this sort would be a burden upon and interference with interstate commerce in violation of the commerce clause of the Federal Constitution, U.S.Const. art. 1, § 8, cl. 3, and quoted from Furst v. Brewster, supra, as follows:

"Accordingly, when a corporation goes into a state other than that of its origin to collect, according to the usual or prevailing methods, the amount which has become due in transactions in interstate commerce, the state cannot, consistently with the limitation arising from the commerce clause, obstruct the attainment of that purpose."

■ We hold, therefore, that the transactions giving rise to the guaranty in question are transactions in interstate commerce and that our foreign corporation law does not apply.

The second matter defense counsel urges is that the guaranty was conditioned, dependent upon and subject to the loan by Oskey to Hardy for the $16,000 down payment advanced by Gorder. The trial court properly permitted testimony by both J. E. Gorder and Berglove as to the circumstances surrounding the execution of Exhibit 1, being the Gorder letter of July 10, 1957, allegedly guaranteeing the open account for purchase of gasoline and other products sold by Oskey to the Pure Joy Oil Company.

■ Upon reviewing the testimony of both J. E. Gorder and Berglove we feel that there is competent substantial evidence from which reasonable inference can be made to support the findings and conclusions of the trial court that the written guaranty of July 10, 1957 was an unconditional guaranty adequately supported by the consideration of plaintiff's acceptance and plaintiff's detriment suffered in reliance thereon. Whitman v. Hanson, 69 S.D. 610, 13 N.W.2d 495; Midwest Oil Co. v. City of Aberdeen, 69 S.D. 343, 10 N.W.2d 701; 5A C.J.S. Appeal and Error § 1642, p. 206.

In view of the fact that we do not hesitate to find that the evidence is sufficient to substantiate the court's finding and conclusion that the written guaranty was an unconditional guaranty with good consideration, it becomes unnecessary to decide the question of estoppel on the part

of the Gorders in failing to withdraw, resist or cancel their written guaranty after discovery that Oskey would not make the loan.

Only one minor point remains. Appellants assign as error the failure of the trial court to make a finding upon a disputed material issue when it failed and refused to make a finding relative to a certain promissory note dated October 15, 1957, and received in evidence as Exhibit 8.

According to the testimony, in September of 1957 Emory Anderson, one of Oskey's sales representatives, requested of J. E. Gorder at Aberdeen that a promissory note evidencing the balance due on an open account at that time be executed and delivered to Oskey. A promissory note in the sum of $9,500 was then furnished to Oskey signed by J. Herschel Hardy and the Pure Joy Oil Company by J. E. Gorder. Counsel for appellants conceded in oral argument that the note was never accepted and therefore the same could not constitute payment.

Appellants further offered a proposed finding of fact to the effect that the note was never accepted by Oskey or by anyone authorized on Oskey's behalf, and offered a conclusion of law that the note was of no force and effect. Counsel cannot now, on appeal, complain of the trial court's failing to make a contrary conclusion to the effect that the promissory note was accepted as payment and satisfaction. Naddy v. Dietze, 15 S.D. 26, 86 N.W. 753; and Roblin v. Palmer, 9 S.D. 36, 67 N.W. 949.

The judgment is affirmed.

All the Judges concur.

NICHOL, Circuit Judge, sitting for SMITH. P.J., disqualified.