**S & H CONTRACTORS, INC., a corporation, Plaintiff–Appellant,**

v.

**A.J. TAFT COAL COMPANY, INC., a corporation, Defendant–Appellee.**

**A.J. TAFT COAL COMPANY, INC., Plaintiff–Appellee,**

v.

**S & H CONTRACTORS, INC., Defendant–Appellant.**

Nos. 87–7028, 88–8829.

United States Court of Appeals, Eleventh Circuit.

July 30, 1990.

Michael T. Thornton, Dennis & Corry, Atlanta, Ga., L. Graves Stiff, III, M. Clay Ragsdale, IV, William A. Davis, III, Starnes & Atchison, Birmingham, Ala., for appellant.

J. Kevin Buster, Freddie Ray Stone, Jr., King & Spalding, Atlanta, Ga., Edward R. Jackson, Tweedy, Jackson & Beech, Jasper, Ala., for appellee.

Before TJOFLAT, Chief Judge, CLARK, Circuit Judge, and SMITH *, Senior Circuit Judge.

TJOFLAT, Chief Judge:

S & H Contractors (S & H) appeals judgments entered, in two separate cases, by the District Court for the Northern District of Alabama and by the District Court for the Northern District of Georgia. The district court, in the first case, granted summary judgment in favor of A.J. Taft Coal Company (Taft) in a suit by S & H against Taft on a contract between those two parties. S & H appealed that judgment, but the appeal was stayed pending arbitration of the parties' dispute. The district court, in the second case, enjoined the arbitration proceedings, and S & H again appealed. The separate appeals were consolidated. We affirm both judgments.

## I.

On May 23, 1984, Taft, an Alabama corporation, entered into a contract with Bucyrus–Erie Company, a Delaware corporation with its principal place of business in Wisconsin, for the purchase of a disassembled "walking dragline"—a large excavating machine used in the coal mining industry. Bucyrus–Erie agreed to transport the dragline parts to Alabama and to send several of its engineers to the assembly site to supervise the machine's assembly, but Taft remained primarily responsible for assembling the dragline.

After entering into the contract with Bucyrus–Erie for the purchase of the dragline, Taft decided to hire a contractor to assemble the dragline and entered into negotiations with S & H, a Kentucky corporation with its primary place of business in Kentucky. The negotiations culminated in a contract signed on December 6, 1984,[1] under which S & H agreed to assemble the dragline under the supervision of the Bucyrus–Erie engineers. At the time of the contract's formation, S & H had not been qualified by Alabama's secretary of state to do business in Alabama. In fact, S & H did not qualify to do business in Alabama until February 3, 1986.

On March 12, 1986, S & H filed a complaint in the United States District Court for the Northern District of Alabama, alleging *inter alia* that it had substantially performed its responsibilities under the contract and that Taft had breached the contract by failing to pay the amounts due for substantial performance and for extra work done by S & H. On March 31, 1986, Taft moved to dismiss the complaint on the ground that, because S & H failed to qualify to do business in Alabama before entering into its contract with Taft, the contract was unenforceable under Alabama's forum-

---

* Honorable Edward S. Smith, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation.

1. There is some dispute over whether the contract was entered into in Alabama or Kentucky, but that dispute is irrelevant to our disposition of these appeals.

closing laws. *See* Ala. Const. art. XII, § 232; Ala.Code § 10–2A–247 (1975). The district court took no action on the motion to dismiss for several months, and, during that period, S & H engaged in fairly extensive pretrial discovery. Then, on November 14, 1986, S & H demanded that Taft arbitrate the dispute under the auspices of the American Arbitration Association as required by an arbitration clause in the contract. On December 12, 1986, the district court converted Taft's motion to dismiss to a motion for summary judgment and granted the motion, holding that S & H's failure to qualify to do business made its contract with Taft unenforceable under Alabama's forum-closing laws. The court therefore dismissed S & H's complaint with prejudice. S & H appealed, but the appeal (No. 87–7028) was stayed pending the outcome of arbitration.

On February 3, 1987, Taft filed suit in the Northern District of Alabama to enjoin arbitration proceedings, arguing that the court had declared the entire contract void in its order dismissing S & H's suit on the contract. On April 17, 1987, the court granted Taft's prayer for relief and enjoined arbitration proceedings in Alabama. The court reasoned that, if the arbitration proceedings were conducted in Alabama, a federal district court in Alabama might be required to enforce the arbitrator's award and, in effect, to enforce the underlying contract.[2] In the court's view, such a result would undermine Alabama's public policy as expressed in its forum-closing laws.

S & H then petitioned the American Arbitration Association to transfer the arbitration proceedings to Atlanta, and the Association granted the petition. On March 29, 1988, Taft filed a complaint in the United States District Court for the Northern District of Georgia, requesting that court to enjoin the arbitration proceedings. Taft argued that the proceedings should be enjoined for two reasons: first, according to Taft, its contract with S & H was void for all purposes, and S & H could not demand arbitration under a void contract. Second,

Taft argued that, by bringing suit on the contract in federal district court before demanding arbitration, S & H waived its right to demand arbitration. Taft then moved for summary judgment. The district court granted the motion and enjoined the arbitration proceedings. The court held that the contract was both unenforceable and void and thus the parties never agreed to submit to arbitration. The court declined to address the waiver issue. S & H again appealed, and that appeal (No. 88–8829) was consolidated with S & H's earlier appeal from the district court's dismissal of the contract action. We address each appeal in order.

### II. S & H's Suit on the Contract

Alabama's constitution provides that, "[n]o foreign corporation shall do any business in this state without ... filing with the secretary of state a certified copy of its articles of incorporation or association." Ala. Const. art. XII, § 232. This provision is enforced through the operation of Alabama's forum-closing statute, which states that

> [a]ll contracts or agreements made or entered into in this state by foreign corporations which have not obtained a certificate of authority to transact business in this state shall be held void at the action of such foreign corporation or any person claiming through or under such foreign corporation by virtue of said void contract or agreement; but nothing in this section shall abrogate the equitable rule that he who seeks equity must do equity....

Ala.Code § 10–2A–247(a) (1975).

■ In diversity cases, we apply a two-step analysis to determine whether Alabama's forum-closing statute bars a foreign corporation's contract claim. First, we determine whether Alabama courts, applying the statute, would refuse the foreign corporation's request to enforce the contract. *See Aim Leasing Corp. v. Heli-*

---

2. The court rejected Taft's characterization of its prior ruling as declaring the contract void for all purposes. Rather, the court explained that it had held the contract to be unenforceable in Alabama courts by the foreign corporation.

*copter Medical Evacuation, Inc.,* 687 F.2d 354, 357 (11th Cir.1982). If we conclude that Alabama courts would close their doors to the foreign corporation, then we must examine the burden such a closing would place on interstate commerce: we will not enforce the forum-closing statute if its enforcement in a particular case would unduly burden interstate commerce in violation of the federal commerce clause. *Id.* We address the state law and federal law questions in turn and hold that the district court properly refused to enforce S & H's contract with Taft.

### A.

■■■■ Alabama courts will not enforce a foreign corporation's contract if (1) at the time the contract was entered into, the foreign corporation had not been qualified by the secretary of state to do business in Alabama, and (2) the foreign corporation was doing business of an intrastate nature in Alabama pursuant to the contract. *See Sanwa Business Credit Corp. v. G.B. "Boots" Smith Corp.,* 548 So.2d 1336, 1337 (Ala.1989). S & H does not dispute that it had failed to qualify to do business in Alabama at the time it entered into the contract with Taft. It does argue, however, that the district court erred in holding that S & H was doing intrastate business in Alabama. We consider the district court's holding on this issue to be sound.

The Alabama Supreme Court has held that a foreign corporation does business in Alabama, within the meaning of the forum-closing provisions, when the contract at issue must be performed by the foreign corporation in Alabama and the contract does not involve interstate commerce. *See Sanjay, Inc. v. Duncan Constr. Co.,* 445 So.2d 876, 880 (Ala.1983). In other words, the foreign corporation's activities must be " 'intrastate in nature.' " *Sanwa,* 548 So.2d at 1337 (quoting *Johnson v. MPL Leasing Corp.,* 441 So.2d 904, 905 (Ala. 1983)). Thus, Alabama courts generally hold that a foreign corporation's sale and delivery of out-of-state goods is a transaction involving interstate commerce and enforce the contract underlying such a trans-

action. *See, e.g., Loudonville Milling Co. v. Davis,* 37 So.2d 659, 661 (Ala.1948).

The contract in this case, however, is not for the sale and delivery of goods; it is solely for the assembly of machinery in Alabama. The contract expressly provides that S & H must "completely erect and deliver [the dragline] to Taft ... at the place hereinafter called the 'erection site' " in Alabama. We conclude that this contract clearly provides for a transaction of an intrastate nature.

S & H would have us believe that, merely because the sale and delivery of the disassembled dragline was a transaction involving interstate commerce, the erection of the dragline must also be a transaction involving interstate commerce. S & H argues that its construction services were "incidental" to the primary interstate transaction. The Alabama Supreme Court, however, has considered and rejected such an argument. The court has repeatedly held that " 'a foreign corporation doing construction work within a state is held to be doing business in that state and is not exempted from local regulation by the fact that it brings materials or laborers into the state.' " *Sanwa,* 548 So.2d at 1339 (quoting *Computaflor Co. v. N.L. Blaum Constr. Co.,* 265 So.2d 850, 852 (Ala.1972)). For example, in *Calvert Iron Works, Inc. v. Algernon Blair, Inc.,* 227 So.2d 424 (Ala. 1969), a foreign corporation contracted to "furnish and erect [in Alabama] certain steel for a specified price." *Id.* at 425. Thus, the contract provided for the sale and delivery of out-of-state goods but also required the foreign corporation to assemble those goods in Alabama. The Alabama Supreme Court held this transaction to be intrastate in nature and refused to enforce the contract. *Id.* at 425–26.

In the present case, because S & H did not contract to supply the out-of-state materials to be assembled, the transaction at issue is even further removed from interstate commerce than the transactions at issue in *Sanwa, Computaflor,* and *Calvert.* We therefore hold that S & H was doing business in Alabama without having been qualified to do so and that Alabama

courts would refuse to enforce S & H's contract with Taft.

## B.

We now must examine the burden placed on interstate commerce by enforcing Alabama's forum-closing statute in this case. Our analysis of this issue is guided solely by federal constitutional law; therefore, our previous holding that, under state law, this transaction is intrastate in nature, does not affect our analysis of the constitutionality of enforcing the forum-closing statute in this case. The district court failed to address this federal constitutional question, apparently operating under the misconception that the federal commerce clause issue and the state law "doing business" issue are identical. The two inquiries are distinct, but we think, nevertheless, that the district court would have reached the same result had it considered the federal commerce clause question separately.

The transaction at issue has both interstate and intrastate aspects. Indeed, if we were inquiring into the constitutionality of *federal* regulation of this transaction, we would likely hold that the transaction involves "commerce which concerns more states than one," *see Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 194, 6 L.Ed. 23 (1824), and would be properly subject to congressional regulation. When we are faced with *state* regulation of such a transaction, however, we ask a different question: Does the regulation, as applied to the transaction at issue, unduly burden interstate commerce? The Supreme Court has held that a state's forum-closing statute does not unduly burden interstate commerce when the foreign corporation has " 'localized its business' " in the state and when it is not entering the state " 'to contribute to or to conclude a unitary interstate transaction.' " *Allenberg Cotton Co. v. Pittman*, 419 U.S. 20, 32–33, 95 S.Ct. 260, 267, 42 L.Ed.2d 195 (1974) (quoting *Union Brokerage Co. v. Jensen*, 322 U.S. 202, 210, 64 S.Ct. 967, 972, 88 L.Ed. 1227 (1944)).

Although the question of localization calls for an ad hoc inquiry into the facts of each case, we have canvassed the Supreme Court's and this court's relevant cases and have distilled two factors that consistently guide the courts' decisions. First, the courts often focus on the permanence and scope of relationships between the foreign corporation and the forum state. *See, e.g., Eli Lilly & Co. v. Sav-on-Drugs, Inc.*, 366 U.S. 276, 280–82, 81 S.Ct. 1316, 1319–20, 6 L.Ed.2d 288 (1961); *Union Brokerage*, 322 U.S. at 210, 64 S.Ct. at 972; *SAR Mfg. Co. v. Dumas Bros. Mfg. Co.*, 526 F.2d 1283, 1284–86 (5th Cir.1976).[3] Second, the courts frequently ask whether the intrastate transaction is an essential element of an interstate transaction. *See, e.g., Allenberg Cotton Co. v. Pittman*, 419 U.S. 20, 30, 95 S.Ct. 260, 266, 42 L.Ed.2d 195 (1974); *York Mfg. Co. v. Colley*, 247 U.S. 21, 24–26, 38 S.Ct. 430, 431–32, 62 L.Ed. 963 (1918); *Diversacon Indus., Inc. v. National Bank of Commerce*, 629 F.2d 1030, 1033 (5th Cir.1980). In our view, both factors weigh in favor of holding the transaction at issue here to be sufficiently localized to permit enforcement of Alabama's forum-closing statute without violating the federal commerce clause.

Our analysis of the permanence and scope of S & H's relations with Alabama begins with the Supreme Court's decision in *Eli Lilly*, 366 U.S. at 276, 81 S.Ct. at 1316. Eli Lilly sought to enforce a contract in New Jersey against a New Jersey corporation, but a state court, relying on the state's forum-closing statute, dismissed the complaint. Eli Lilly, an Indiana corporation, was actively engaged in the sale and delivery of goods in interstate commerce but had established a permanent branch office in New Jersey. Eli Lilly leased office space in the state and maintained a staff of approximately eighteen employees who were in frequent contact with the company's New Jersey customers. *Id.* at 279–81, 81 S.Ct. at 1319. The Supreme Court held that, given this degree of contact with

---

**3.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

the State of New Jersey, the federal commerce clause would not be violated by enforcement of the state's forum-closing statute against Eli Lilly. *Id.* at 280–82, 81 S.Ct. at 1319–20.

This court reached the same conclusion in *SAR Manufacturing*, 526 F.2d at 1283. In that case, a Texas corporation, prior to the transaction at issue, leased a warehouse in Alabama for the purpose of temporarily storing goods shipped from Texas to the corporation's Alabama customers. The foreign corporation employed several full- and part-time employees at the Alabama warehouse. *Id.* at 1284. All of the corporation's business in Alabama was transacted out of the Alabama warehouse, with the exception of the actual manufacturing of the goods in Texas. This court found the facts of the case to be substantially similar to the facts of *Eli Lilly* and held that enforcement of the Alabama forum-closing statute was constitutional. *Id.* at 1285–86.

While the facts of the case at hand are not identical to the facts of either *Eli Lilly* or *SAR*, we think the facts are similar in many important respects. Although S & H apparently did not maintain a permanent presence in Alabama, the record indicates that assembly of the dragline, with no delays, would require almost one year. Furthermore, S & H had been engaged in similar projects in Alabama on at least four other occasions. To complete the dragline at issue here, S & H sent four or five part-time employees and one full-time employee to the erection site, leased apartments in the area for those employees, transported a substantial amount of equipment to the site, maintained a telephone system in a trailer on the site, and hired numerous other union employees for the job. In light of these facts, we have no difficulty in finding S & H's relations with Alabama to be substantial and relatively permanent.

We also think that the transaction at issue here was not an essential or necessary element of an interstate transaction. We have compared this case with other cases in which the intrastate transaction

was found to be a necessary element of an interstate transaction, and we think those cases are easily distinguishable from the present case. For example, in *York Manufacturing*, 247 U.S. at 21, 38 S.Ct. at 430, the transaction involved an interstate sale and delivery of a disassembled ice machine to be assembled in the forum state under the supervision of the manufacturer/seller's engineer. Apparently, the machine was so complex that the engineer's services were required to assemble the machine properly. *Id.* at 22, 38 S.Ct. at 431. The Court held that the forum-closing statute could not be enforced in that case because "the service to be done in [the forum] state as the result of an interstate commerce sale was essentially connected with the subject-matter of the sale, that is, might be made to appropriately inhere in the duty of performance." *Id.* at 24, 38 S.Ct. at 431. The Court went on to distinguish those cases in which an "inherently intrastate [transaction] did not lose its essential nature because it formed part of an interstate commerce contract to which it had no *necessary* relation." *Id.* at 26, 38 S.Ct. at 432 (emphasis added).

The Supreme Court returned to the subject in *Allenberg Cotton*, 419 U.S. at 20, 95 S.Ct. at 260. The underlying transaction in *Allenberg* involved a contract for the sale and delivery of cotton. The buyer, a foreign corporation, maintained a warehouse in the forum state and entered into contracts with local cotton farmers. Under the contract, which was a typical "forward" contract, the farmer promised to deliver a certain amount of cotton, grown during the next season, to the foreign corporation's warehouse in the forum state. The foreign corporation then sorted the cotton at the warehouse and sold the cotton to buyers outside the forum state. The Court considered the importance of this type of contract to middlemen, such as the foreign corporation, who needed forward contracts to cover their expenses. *See id.* at 26, 95 S.Ct. at 264. The Court held that "[d]elivery of the cotton to a warehouse, taken in isolation, is an intrastate transaction. But that delivery is also essential for the completion of the interstate transac-

tion...." *Id.* at 30, 95 S.Ct. at 266. Therefore, the Court refused to enforce the state's forum-closing statute. *Id.* at 34, 95 S.Ct. at 267; *see also Diversacon,* 629 F.2d at 1033 (forum-closing statute not enforced when intrastate transaction is "an integral part of an overall interstate pattern or transaction").

Two key facts distinguish this case from *Allenberg, York,* and *Diversacon.* First, Taft did not even begin seeking a company to assemble the dragline until *after* it had entered into the contract to purchase the dragline from Bucyrus–Erie. Second, other companies, including an Alabama corporation and Taft itself, could have assembled the dragline. We would be ignoring reality if we concluded on these facts that the erection contract constituted a "neces-

sary," "essential," or "integral" part of the interstate sale of the dragline.[4] Indeed, entering into the erection contract might be better characterized as an afterthought—something that was not a precondition of the interstate sale and that Taft did not have to do in order to utilize the machine.

S & H's relations with Alabama were significant and lengthy; furthermore, the erection contract was not an essential element of an interstate transaction. We therefore hold that S & H's operations were sufficiently localized in Alabama to allow Alabama courts to enforce the forum-closing statute against S & H without offending the federal commerce clause. Thus, we affirm the district court's order dismissing S & H's suit on the contract.[5]

4. In concluding that this case is controlled by *York,* the dissent fundamentally misreads that case. In *York,* the Court determined whether the state's forum-closing statute could operate to preclude enforcement of the *contract to supervise* construction of the ice machine. The *seller's* contract in *York* was much like the *seller's* contract in this case. The *York* contract provided that the seller would ship the parts and would send an engineer to supervise assembly, but that the buyer would be responsible for providing mechanics to assemble the machine. *See* 247 U.S. at 22, 38 S.Ct. at 431. The Court, however, did not address the enforceability of the mechanics' contract; rather, it considered whether the *seller's contract to provide a supervisor* could be enforced. *Id.* at 22–23, 38 S.Ct. at 431.

In this case, we are not asked to enforce Alabama's forum-closing statute against Bucyrus–Erie in a suit to recover payment for the services of Bucyrus–Erie's engineer. That case would be controlled by *York,* and we would undoubtedly not enforce Alabama's forum-closing statute. What we are asked to do is enforce the forum-closing statute against a party providing *local construction services.* Thus, the question is not, as the dissent maintains, whether assembly of the machine was complex and required supervision, but whether *the service at issue* "was essentially connected with the subject-matter of the sale, that is, might be made to appropriately *inhere in the duty of performance.*" *Id.* at 24, 38 S.Ct. at 431 (emphasis added). Certainly, Bucyrus–Erie's promise to send an engineer to supervise assembly was so essential to the sale that it could be considered part of Bucyrus–Erie's "duty of performance." In essence, that is what the dissent is arguing—unfortunately, the dissent is arguing about the wrong case. Since we are concerned only about S & H's contract to provide construction servic-

es in Alabama, we must ask whether those services were so "essentially connected" to the *sale* of the dragline parts that they could be considered part of the *seller's* (i.e. Bucyrus–Erie's) "duty of performance." The facts clearly show that S & H's services were not so connected to the sale.

Finally, the dissent seems to imply that if the machine (which has been sold in interstate commerce) is useless unless it is assembled, then assembling the machine is essentially connected to the sale. While this argument has some logical appeal, it completely rejects the teaching of *Browning v. City of Waycross,* 233 U.S. 16, 34 S.Ct. 578, 58 L.Ed. 828 (1914). In *Waycross,* which the *York* Court cited extensively and eventually distinguished, the Court held that the assembly of light poles, which had been shipped in interstate commerce, was a local activity. *Id.* at 22–23, 34 S.Ct. at 580. Obviously, light poles are useless unless assembled. Thus, while a "uselessness" test is appealing because of its easy application, the Supreme Court has indicated that something more than uselessness is needed to show an essential connection to an interstate sale.

5. In its amended complaint, S & H also sought relief based on a theory of *quantum meruit* and requested the court to establish a lien on the dragline in favor of S & H. We note that S & H's request for relief based on *quantum meruit* might have raised the difficult question of whether such a suit constitutes a suit on the contract within the meaning of the forum-closing statute. *See First Bank v. Wells,* 358 So.2d 435, 437 (Ala.1978) (forum-closing statute bars only suit on contract, not suits based on "equitable rights long recognized by our jurisprudence"). This question, however, has not been presented on appeal, and we therefore have no occasion to address it.

### III. Taft's Suit to Enjoin Arbitration

As we note above, the District Court for the Northern District of Georgia granted Taft's motion for summary judgment and enjoined arbitration on the ground that the contract between S & H and Taft was void for all purposes. The court refrained from addressing Taft's argument that S & H, by bringing suit on the contract, waived its right to arbitrate under the contract. We affirm the district court's order enjoining arbitration, but we do it for a different reason. We think that the issue whether the contract, and hence the arbitration clause, is void for all purposes presents extremely difficult questions of state law that we should avoid if possible. Indeed, in this case, there is no need to resolve these difficult questions of state law since, even if the arbitration clause is enforceable, S & H waived its right to arbitrate. Our determination of whether S & H waived its right to arbitration, as opposed to whether the contract is void under Alabama law, is controlled solely by federal law. *See Huber, Hunt & Nichols, Inc. v. Architectural Stone Co.*, 625 F.2d 22, 25 & n. 8 (5th Cir.1980); *E.C. Ernst, Inc. v. Manhattan Constr. Co.*, 551 F.2d 1026, 1040 (5th Cir. 1977), *cert. denied sub nom. Providence Hosp. v. Manhattan Constr. Co.*, 434 U.S. 1067, 98 S.Ct. 1246, 55 L.Ed.2d 769 (1978).

■ We have held that, despite the strong policy in favor of arbitration, *see Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22–23, 103 S.Ct. 927, 940–41, 74 L.Ed.2d 765 (1983), a party may, by its conduct, waive its right to arbitration. *See E.C. Ernst, Inc. v. Manhattan Constr. Co.*, 559 F.2d 268, 269 (5th Cir.1977). Thus, a party that "[s]ubstantially invok[es] the litigation machinery" prior to demanding arbitration may waive its right to arbitrate. *Id.* A party has waived its right to arbitrate if, "under the totality of the circumstances, the . . . party has acted inconsistently with the arbitration right," *National Found. for Cancer Research v. A.G. Edwards & Sons*, 821 F.2d 772, 774 (D.C.Cir.1987), and, in so acting, has in some way prejudiced the other party, *Miller Brewing Co. v. Fort Worth Distrib. Co.*, 781 F.2d 494, 497 (5th Cir. 1986). When determining whether the other party has been prejudiced, we may consider the length of delay in demanding arbitration and the expense incurred by that party from participating in the litigation process. *See Frye v. Paine, Webber, Jackson & Curtis, Inc.*, 877 F.2d 396, 399 (5th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1318, 108 L.Ed.2d 493 (1990).

■ In this case, S & H waited eight months from the time it filed its complaint to the time it demanded arbitration. *See Miller Brewing*, 781 F.2d at 497 (plaintiff waited eight months after filing suit in state court to announce intention to arbitrate). During that time, Taft filed two motions—a motion to dismiss and an opposition to S & H's motion for discovery. Additionally, S & H took the depositions of five Taft employees (totalling approximately 430 pages) prior to demanding arbitration. We conclude from these facts that, as a matter of law, Taft was prejudiced by S & H's delay in demanding arbitration and by its invocation of the litigation process. Furthermore, we find that S & H acted inconsistently with its arbitration right. S & H, therefore, has waived its right to arbitrate, and we affirm, on that ground, the district court's order enjoining the arbitration proceedings.

### IV.

For the foregoing reasons, we affirm both the judgment of the District Court for the Northern District of Alabama dismissing S & H's suit on the contract and the judgment of the District Court for the Northern District of Georgia enjoining the arbitration proceedings.

AFFIRMED.

CLARK, Circuit Judge, dissenting:

Respectfully, I dissent. The majority opinion incorrectly analyzes the facts when (1) it finds that S & H's work in Alabama was not an essential element of an unitary interstate transaction and (2) it finds that S & H localized its business in Alabama notwithstanding the evidence clearly showing

that S & H was there for the sole purpose of the contract in question.

The majority unsuccessfully attempts to distinguish a case whose facts are very similar to those in this case. In *York Mfg. Co. v. Colley*, 247 U.S. 21, 38 S.Ct. 430, 62 L.Ed. 963 (1918), York sued a Texas purchaser who refused to pay York's bill, and the Court recited the following:

> At the trial it was shown without dispute that the contract covered an ice plant guaranteed to produce three tons of ice a day, consisting of gas compression pumps, a compressor, ammonia condensers, freezing tank and cans, evaporating coils, a brine agitator and other machinery and accessories, including apparatus for utilizing exhaust steam for making distilled water for filling the ice cans. These parts of machinery, it was provided, were to be shipped from Pennsylvania to the point of delivery in Texas and were there to be erected and connected. This work, it was stipulated, was to be done under the supervision of an engineer to be sent by the York Manufacturing Company for whose services a fixed per diem charge of $6 was to be paid by the purchasers and who should have the assistance of mechanics furnished by the purchasers, the supervision to include not only the erection but the submitting of the machinery to a practical test in operation before the obligation to finally receive it would arise.

> \*    \*    \*    \*    \*    \*

> Was the particular provision of the contract for the service of an engineer to assemble and erect the machinery in question at the point of destination and to practically test its efficiency before complete delivery relevant and appropriate to the interstate sale of the machinery? When the controversy is thus brought in last analysis to this issue there would seem to be no room for any but an affirmative answer. Generically this must be unless it can be said that an agreement to direct the assembling and supervision of machinery whose intrinsic value largely depends upon its being united and made operative as a whole is

not appropriate to its sale. The consequence of such a ruling if made in this case would be particularly emphasized by a consideration of the functions of the machinery composing the plant which was sold, of its complexity, of the necessity of its aggregation and unison with mechanical skill and precision in order that the result of the contract of sale— the ice plant purchased—might come into existence.

247 U.S. at 22, 25, 38 S.Ct. at 431–32.

In referring to the legal standard in this type of case, our predecessor court in *Diversacon* (discussed *infra*) stated the legal test as follows: "Essentially, the [Supreme] Court included in a federal definition of interstate commerce any activity of an intrastate nature which was an integral part of an overall interstate pattern or transaction." 629 F.2d 1030, 1033 (5th Cir. 1980) (citations omitted).

### FACTS

In the present case, Bucyrus–Erie (Bucyrus), a foreign corporation, contracted with Taft to sell it an unassembled dragline, which because of its huge size, could not be shipped assembled. Bucyrus was not in the business of assembling such large items. The sales contract expressly provided that Bucyrus would furnish A.J. Taft Coal Company (Taft) with a resident engineer to oversee the entire 275–day assembly process. Additionally, Bucyrus agreed to provide follow-up service of six visits at three-month intervals after completion of assembly to assure the machine was functioning properly. Finally, the contract between S & H Contractors (S & H) and Taft expressly incorporates provisions in the Bucyrus/Taft contract which pertain to assembly. The circumstances surrounding the formation of the sales and subsequent assembly contracts demonstrate that Taft relied heavily on Bucyrus in selecting a suitable assembly contractor. Taft requested and received from Bucyrus its list of assembly contractors who were capable of assembling this type of equipment. S & H was one of the contractors on the list and one which Bucyrus specifically recom-

mended to Taft. Bucyrus and S & H had worked together on assembly projects in the past. Several former Bucyrus employees were employed by S & H which, according to the deposition testimony, satisfied Taft that S & H had the necessary expertise to assemble this model dragline.

The record shows that assembly of this machine involved an extremely complex operation. The contract provision to provide a supervising engineer indicates that Taft and Bucyrus considered it sufficiently complex to require Bucyrus' expertise. The deposition testimony reveals that the Bucyrus engineer actively participated in the day-to-day assembly process. In fact, it appears that Bucyrus retained some control over the process. David Elmore, a general superintendent with Taft and Taft's assembly supervisor, testified that near the end of the assembly process when S & H wished to walk the dragline from the assembly pad to the mining pit, the Bucyrus engineer "wouldn't sign off the machine because BE was still liable for the machine until the electrical work was completed." The dragline component delivery schedule also indicates that assembly of the dragline was contemplated by and keyed to the sales contract. Bucyrus did not deliver all the parts of the machine at the same time. When S & H started work on January 15, 1985, many parts had not been delivered and parts continued to arrive through December 1985. Bucyrus delivered parts as they became necessary in the assembly process.

The shear size of the dragline is also indicative of the complexity of the assembly procedure. The 1300-W is immense; the boom is 285 feet long and the bucket has a forty-five yard capacity. The completed dragline weighs over 650 tons. Finally, the 1300-W erection procedure—which was partially incorporated into the assembly contract—shows that assembly of the 1300-W required significant specialized expertise. Bucyrus notes in the assembly procedure that assembly takes approximately 62,000 man-hours to complete and requires a variety of skilled laborers including electricians, pipefitters and welders.

The majority's strategy is to show that the assembly was not part of a unitary interstate transaction by contending that assembly was not essential to the sale of a dragline. In support of its argument, the majority relies on two irrelevant arguments. First, the majority relies on the fact that Taft did not begin its search for a contractor to assemble the dragline until after it had signed the sales contract with Bucyrus. However, the majority's reliance on the timing of the two contracts as demonstrating that assembly is not part of a unitary transaction is fundamentally flawed as any negotiations with S & H would have been for naught if S & H did not have the expertise to assemble the dragline which Taft ultimately selected. Second, the majority argues that assembly was not essential to the sales contract because Taft could have assembled the dragline itself. This conclusion is contrary to the available deposition testimony. A.J. Taft, Jr. testified that Taft did not have sufficient manpower available to assemble the dragline. He also stated that certain aspects of the assembly work on the 1300-W were far more involved than that on the much smaller dragline which Taft had previously assembled. Additionally he noted that Taft had not assembled any dragline since 1979.

## DISCUSSION

Application of Alabama's forum closing law in this case creates an impermissible burden on interstate commerce. The majority discusses a number of decisions in this area and concludes that two factors "consistently guide the courts' decisions." One is the interrelationship between the intrastate and interstate portions of the transactions. Another is the permanence of the relationship between the foreign corporation and the forum state.

A. The Reach of Interstate Commerce in Assembly Contracts.

The Supreme Court in three cases has considered the importance of the complexity of assembly in determining whether the

assembly is an integral indispensable part of the sales contract. The *York Mfg. Co. v. Colley* case has already been discussed in part.[1]

In *York*, defendant Colley argued that the supervision of the assembly portion of the contract was separate and distinct from the delivery portion, and concluded, therefore, that since supervision was a wholly intrastate transaction, the plaintiff's suit was due to be dismissed for plaintiff' failure to qualify to do business in the state. The Texas court agreed, but the Supreme Court reversed. The Court concluded that assembly and testing would be "relevant and appropriate" to the interstate sale of such complex machinery, "unless it can be said that an agreement to direct the assembling and supervision of machinery whose intrinsic value depends upon its being united and made operative as a whole is not appropriate to its sale." *Id.* 38 S.Ct. at 432. Throughout the opinion, the Court emphasized the complexity of the endeavor and the fact that the purchaser bought an ice machine, not the parts of an ice machine.[2] The terms of the supervising engineer provision in the Bucyrus/Taft contract evidences a closer relationship between assembly and sale than did the arrangement in *York*.[3] The engineer from York Mfg. worked on a per diem basis which was paid by the purchaser, whereas here, the Bucyrus engineer's services were provided by Bucyrus as part of the sales contract.

In *Browning v. City of Waycross*, 233 U.S. 16, 34 S.Ct. 578, 579–80, 58 L.Ed. 828 (1914), the Court concluded that installation of lightning rods, sold in interstate commerce and installed locally by employees of the seller, was not in interstate commerce. The installation was a wholly intrastate affair and "bore no relevant or appropriate relation to interstate commerce." *York*, 38 S.Ct. at 431. In *York*, the Court distinguished *Waycross*, concluding that it "was not controlling as to a case where the service to be done in a state as the result of an interstate commerce sale was *essentially* connected with the subject-matter of the sale, that is, might be made to appropriately inhere in the duty of performance." *Id.* (emphasis added).

Finally, in *General Railway Signal Co. v. Virginia*, 246 U.S. 500, 38 S.Ct. 360, 62 L.Ed. 854 (1918), the State of Virginia contracted with General Railway to purchase and install automatic railway crossing signals at various locations in the state. General Railway manufactures many of the components required for installation; however, "to construct these signals as required by the contract it was necessary to employ in this state labor, skilled and unskilled, to dig ditches in which conduits for the wires are placed, to construct concrete foundations, and to paint completed structures." *Id.* The Court concluded that "the recited facts clearly show local business separate and distinct from interstate commerce." *Id.* The Court commented that this case was very similar to the lightning

---

1. This case is also cited and discussed in the majority's opinion *supra* pp. 1510, 1511–12.

2. Taft purchased an unassembled dragline. However, it, like the ice machine, was of no use until it was assembled. Taft had to supply a location and mechanics to be supervised, but the contract with Bucyrus clearly contemplated that Bucyrus' obligation would not be discharged until after the dragline was operational. The majority's observation that "entering into an erection contract ... [was something] Taft did not have to do in order to utilize the machine," is simply not supportable by the record or common sense. It required over a year of work to get the machine operational so that Taft might "utilize" it. The dragline closely resembles the ice machine, "whose intrinsic value depends on its being united and made operative as a whole." *York*, 38 S.Ct. at 432.

3. The majority notes: "Apparently, the [ice] machine was so complex that the engineer's services were required to assemble the machine properly." *Supra* p. 1512. As I noted previously, assembly of the dragline was also extraordinarily complex, a conclusion which is supported by the fact that an engineer's services were required to assemble the machine and it took 275 working days to complete. In another part of the opinion, the majority relies on the 275 days as evidence of S & H's permanent presence in the state. *Supra* p. 1512. Taken together, the majority's observations compel the incomprehensible conclusion that assembly may only be of only medium complexity to be in interstate commerce. Too easy and it is not essential, too hard and it indicates permanent presence.

rods case. In *York*, the Court distinguished this case stating, "the work required to be done by the contract over and above its inherent and intrinsic relation to the subject-matter of the interstate commerce contract involved the performance of duties over which the state had a right to exercise control because of their inherent intrastate character." 38 S.Ct. at 432.

These Supreme Court cases indicate that the fundamental question in construction or installation type cases is whether it is appropriate and essential for the seller/manufacturer to continue its involvement after delivery. It satisfies this standard if the subject matter of the sale is sufficiently complex, or if the seller's expertise is necessary to bring the item purchased into useful existence following delivery. With this synthesis in mind, assembly of the dragline was clearly essential to its sale and therefore was part of a unitary interstate transaction. Given the complexity of the assembly process in this case, the majority illogically concludes that assembly was an afterthought.

The majority attempts unsuccessfully to distinguish *York* from the instant case. The majority notes that "the [ice] machine was so complex that the [manufacturer/seller's] engineer's services were required to assemble the machine properly." Elsewhere the majority notes that "other companies, including an Alabama corporation and Taft itself, could have assembled the dragline." *Supra* pp. 1512, 1513. (Without any support from the evidence). These comments evidence the majority's misunderstanding of *York*. In that case, it is clear that the *purchaser* supplied the mechanics to assemble the ice machine. 34 S.Ct. at 431. The purchaser simply acted as both the general contractor and labor pool. However, the engineer from York Mfg. supervised the entire process. That the purchaser performed the assembly labor did not diminish the complexity of the

assembly process. The Court focused on whether the subject matter of the contract was sufficiently complex to render its assembly essential to its sale. It was the fact that assembly required the supervising engineer's expertise that influenced the court's decision. In the instant case, the purchaser instead hired S & H as a general contractor who in turn hired other workmen. This nuance does not alter the analysis. As in *York*, the engineer's expertise was required to complete assembly. There is nothing in the record that indicates Taft and Bucyrus considered S & H a replacement for the supervising engineer. In fact, the record supports the contrary conclusion which is that all parties to these contracts considered assembly of the dragline essential to its sale.

## B. Establishing A Permanent Presence.

In *SAR Mfg. v. Dumas Bros. Mfg.*, 526 F.2d 1283 (5th Cir.1976), the court concluded that the state's forum closing statute did not work an impermissible burden on interstate commerce when applied to the activities and transactions conducted by Sar in Alabama. Sar was engaged in the sale of polyurethane foam which it manufactured in plants located in Texas, Georgia and Mississippi. Sar leased a warehouse in Alabama to receive and store the foam for processing and subsequent sale to in-state concerns. Sar employed seven full or part-time employees at the warehouse and maintained two vehicles at the warehouse on a full-time basis. On appeal, the court concluded that subjecting Sar to the state's forum closing laws did not impermissibly burden interstate commerce.

The court relied on two Supreme Court cases [4] and concluded that Sar's intrastate foam sales were very much like Eli Lily's intrastate drug sales. The court distinguished *Allenberg Cotton*, on the notion that under the facts in *SAR*, no nationwide marketing system would be impeded. 526

---

**4.** *Allenberg Cotton Co. v. Pittman*, 419 U.S. 20, 95 S.Ct. 260, 42 L.Ed.2d 195 (1974) (intrastate contract between cotton farmer and out-of-state cotton merchant's in-state broker essential to interstate marketing mechanism and interstate aspect predominated); and *Eli Lily & Co. v.*

*Sav–On–Drugs*, 366 U.S. 276, 81 S.Ct. 1316, 6 L.Ed.2d 288 (1961) (independent efforts at in-state marketing and distribution accomplished by Eli Lily's in-state office, enough to break interstate commerce connection).

F.2d at 1285. The distinction drawn by the court turns on the connection between intrastate and interstate portions of the transaction. The issue is whether the intrastate portion has taken on an independent character of its own that separates it from the interstate portion. Stated differently, if the out-of-state entity has performed sufficient in-state acts to render the two aspects of the overall transaction distinct, then the entity is subject to the forum closing laws. One factor which the court found to be probative of this independent character is whether the out-of-state entity has set up a permanent in-state presence. However, the focus of the court's analysis remained whether the intrastate transaction is an essential element of a unitary interstate transaction.

The next case is *Diversacon Industries v. Nat'l Bank of Commerce*, 629 F.2d 1030, 1034–35 (5th Cir.1980), where the plaintiff, a highway construction contractor, contracted to build a portion of interstate highway in Louisiana. Diversacon, a Florida corporation, set up its administrative support personnel in its parent company's Jackson, Mississippi office. One of Diversacon's subcontractors defaulted and the defendant Bank refused to honor its construction surety agreement because Diversacon had failed to qualify to do business in the state. The court of appeals concluded that "the scope of Diversacon's activities extended beyond the Mississippi border for the consummation of a definite interstate project," thus "it would be an impermissible burden on interstate commerce to give effect to denial of access through this qualification statute." *Id.* at 1034. The subcontract between Diversacon and the subcontractor did not lose its interstate character simply because the general contractor established a presence in the subcontractor's home state. The court noted that the Supreme "Court included in a federal definition of interstate commerce any activity of an intrastate nature which was an integral part of the overall interstate pattern or transaction." *Id.* at 1033. The court further observed that "the agreement upon which Diversacon is suing the Bank is clearly the single business transaction to which all of diversacon's activities related—the construction of the Louisiana highway." *Id.* at 1034. This case is highly relevant to the present inquiry, where the out-of-state entity, S & H, contracted with local workers to work on a project that is in interstate commerce. The record in this case shows that S & H has not established a presence in the state, any more permanent than was Diversacon's. Both S & H and Diversacon were present in the state for the sole purpose of completing a project which was in interstate commerce. The Diversacon court acknowledged the probative value of Diversacon's presence in the state, but remained focused on the work performed and whether it was part of a unitary interstate transaction.

Because I believe assembly of the 1300–W was an essential element of an interstate transaction and nothing under the facts of this case removes the transaction's interstate character, I would hold that application of Alabama's forum closing law effects an impermissible burden on interstate commerce. Since the majority has concluded otherwise, however, I respectfully DISSENT.