**ARAB AFRICAN INTERNATIONAL BANK, Appellant,**

v.

**Jonathan I. EPSTEIN; Richard S. Goldman; Goldman & Epstein; Kendis & Baker, P.C.; Sherman L. Kendis.**

**ARAB AFRICAN INTERNATIONAL BANK**

v.

**Jonathan I. EPSTEIN; Richard S. Goldman; Goldman & Epstein; Kendis & Baker, P.C.; Sherman L. Kendis.**

**Jonathan I. Epstein, Richard S. Goldman and Goldman & Epstein, Appellants.**

Nos. 92–5645, 92–5646.

United States Court of Appeals, Third Circuit.

Argued July 7, 1993.

Decided Nov. 30, 1993.

Merrill M. O'Brien (argued), Dollinger & Dollinger, Rochelle Park, NJ, for appellant in No. 93–5645.

Ana L. Day (argued), Voorhees & Acciavatti, Morristown, NJ, for appellants in No. 93–5646.

Before: SLOVITER, Chief Judge, and NYGAARD and WEIS, Circuit Judges.

## OPINION OF THE COURT

NYGAARD, Circuit Judge.

In this legal malpractice action the district court granted summary judgment in favor of Jonathan I. Epstein, Richard S. Goldman, and the law firm of Goldman & Epstein (the "Epstein defendants"). Arab African International Bank appeals the summary judgment and the denial of its motion for leave to amend its complaint to assert a claim under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"). The Epstein defendants appeal the denial of their motion for sanctions under Fed.R.Civ.P. 11. For the following reasons,

we will reverse the summary judgment, affirm the denial of sanctions and leave to amend, and remand the cause to the district court.

### I.

This case, now in its second appearance before us, arises out of Sencit F/G Development Company's default on a $3.25 million mortgage loan from Arab African. Arab African is an Egyptian bank with a place of business in New York. Sencit, a New Jersey partnership, was represented by the Epstein defendants in the loan transaction with Arab African. The property securing the loan is in New Jersey.

The loan documents originally provided that they would be executed in New Jersey and that New Jersey law would apply. Both designations were changed to New York, however, because the New Jersey Banking Act, N.J.Stat.Ann. § 17:9A–315 et seq. (the "Act"), prohibits foreign banks from doing business in New Jersey. At Arab African's request, the Epstein defendants issued an opinion letter, signed by Epstein, stating that

the Mortgage and Note ... constitute binding, and enforceable agreements of the Partnership in accordance with their terms (subject as to enforcement of remedies to applicable bankruptcy, reorganization, insolvency, moratorium or other laws or equitable principles affecting the enforcement of creditor's rights, generally from time to time in effect).

After Sencit defaulted, Arab African commenced foreclosure proceedings in the Superior Court of New Jersey, Chancery Division. Sencit moved to dismiss the action, asserting that it was barred by section 330 of the Act, which provides:

A. A foreign bank shall not be entitled to maintain any action in any court of this State on any cause arising out of its transaction of business in this State in violation of the provisions of this article.

B. A foreign bank which violates any of the provisions of this article and its directors, officers, agents and employees who participate in any such violation shall be guilty of a misdemeanor.

N.J.Stat.Ann. § 17:9A–330. After a two-day trial on the issue of where the transaction had occurred, the court ruled in Sencit's favor, holding that Arab African was a foreign bank that had done business in New Jersey in violation of the Act and therefore could not file its foreclosure actions in a New Jersey court. Arab African argued that, in light of the choice of law clause and the Epstein defendants' opinion letter, Sencit was estopped from raising the Act as a defense, but the court rejected this contention for two reasons: first, because Arab African had not relied on the opinion letter, and second, because estoppel does not apply to defenses based on penal statutes. Arab African did not raise the issue of the Act's constitutionality in the foreclosure action.

Arab African then sued in the United States District Court for the District of New Jersey, asserting claims of fraud, material misrepresentation and negligence against the Epstein defendants and against its own attorney and his law firm.[1] The Epstein defendants moved for summary judgment based in part upon the doctrine of issue preclusion. The district court found that the New Jersey Superior Court's determination that Arab African did not rely on the Epstein defendants' opinion letter precluded Arab African from relitigating the reliance issue, which was essential to its claims against them, and granted the motion. We reversed and remanded. *Arab African Int'l Bank v. Epstein*, 958 F.2d 532 (3d Cir.1992).

On remand, the Epstein defendants again moved for summary judgment, arguing that the Act precluded Arab African's suit. Arab African opposed the motion arguing that an application of the Act would violate the Commerce Clause. Relying on the Act and finding no constitutional violation, the district court granted the motion. Arab African moved for and was denied reconsideration and leave to file an amended complaint to assert a RICO claim. The Epstein defen-

---

1. Arab African later voluntarily dismissed its claims against its attorney's now-defunct law firm.

dants then moved for and were denied Rule 11 sanctions. This appeal followed.

## II.

■ The district court had jurisdiction under 28 U.S.C. § 1332(a), and we have jurisdiction over the appeal under 28 U.S.C. § 1291. Our review of the summary judgment is plenary, and we view the facts and all inferences in a manner most favorable to Arab African, the non-moving party. *Arab African,* 958 F.2d at 534. We review the district court's denials of leave to amend the complaint and Rule 11 sanctions for abuse of discretion. *See Berger v. Edgewater Steel Co.,* 911 F.2d 911, 916 (3d Cir.1990), *cert. denied,* 499 U.S. 920, 111 S.Ct. 1310, 113 L.Ed.2d 244 (1991); *Lony v. E.I. Du Pont De Nemours & Co.,* 935 F.2d 604, 615 (3d Cir. 1991).

### A.

■ We reject the Epstein defendants' arguments that Arab African is estopped, either by claim preclusion or New Jersey's entire controversy doctrine, from arguing the Act's constitutionality. Claim preclusion, which prevents a party from litigating issues that might have been but were not raised in a prior action, *Gregory v. Chehi,* 843 F.2d 111, 116 (3d Cir.1988), attaches when there has been: "(1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same causes of action." *United States v. Athlone Indus., Inc.,* 746 F.2d 977, 983 (3d Cir.1984); *see Watkins v. Resorts Int'l Hotel & Casino,* 124 N.J. 398, 412, 591 A.2d 592, 598 (1991). The foreclosure action and this action involve different defendants and different causes of action; accordingly, claim preclusion does not apply.

■ The entire controversy doctrine "embodies the principle that the adjudication of a legal controversy should occur in one litigation in only one court...." *Cogdell v.*

*Hospital Center at Orange,* 116 N.J. 7, 560 A.2d 1169, 1172 (1989). It initially required litigants to assert all claims and defenses relating to the controversy between them in one action, but in 1989 was expanded to also require joinder in a single action of "all persons who have a material interest in the controversy." *Cogdell,* 560 A.2d at 1178. Although Arab African correctly points out that the 1989 requirement of joinder of parties does not govern the 1986 foreclosure action, *see id.* at 1179, this fact is irrelevant. The Epstein defendants do not argue that the doctrine required Arab African to bring the legal malpractice claims against them in the foreclosure action. Indeed, Arab African could not have done so, as it did not have a basis for these claims until after it lost in that action.

Rather, the Epstein defendants argue that, under the entire controversy doctrine, Arab African's failure to argue that the Act was unconstitutional in the foreclosure action in response to Sencit's assertion of it as a defense precludes them from making the argument here. We disagree. The entire controversy doctrine is an equitable one that seeks to "advance[ ] the goals of fairness, efficiency and finality." *Watkins v. Resorts Int'l Hotel & Casino,* 124 N.J. 398, 412, 591 A.2d 592, 598 (1991). Since Arab African's legal malpractice claims against the Epstein defendants properly constitute a second lawsuit, we see no unfairness or inefficiency in allowing Arab African to raise its constitutional argument here.

### B.

■ It is undisputed that under the Act, Arab African cannot avail itself of the New Jersey courts, or, correspondingly, of the federal courts in New Jersey sitting in diversity. *See Woods v. Interstate Realty Co.,* 337 U.S. 535, 538, 69 S.Ct. 1235, 1237, 93 L.Ed. 1524 (1949). The issue on this appeal is whether such an application of the Act violates the Commerce Clause.[2] The district

---

2. Arab African also advances the argument that the Act is unconstitutional *per se,* in addition to as applied. However, Arab African did not raise a *per se* challenge in connection with the Epstein defendants' summary judgment motion, but only

on their motion for reconsideration after summary judgment had been granted, and the district court accordingly refused to consider it. *See* Rule 12I of the General Rules of the United States District Court for the District of New

court, in granting summary judgment for the Epstein defendants, found that no constitutional problem was presented. We disagree.

 The Constitution accords to Congress "the power to regulate commerce with foreign Nations, and among the Several States, and with the Indian Tribes." U.S. Const., art. I, § 8, cl. 3. This clause not only constitutes an affirmative grant of power to Congress; it also "prevents the States from erecting barriers to the free flow of interstate commerce." *American Trucking Ass'n v. Larson,* 683 F.2d 787, 790 (3d Cir.1982). Thus, we have stated that

> the commerce clause limits the power of a state to impose its choice of law on any transaction that is within the broad ambit of congressional power to regulate interstate commerce, and ...
>
> (2) is one in which Congress has made no specific choice of law, but ...
>
> (c) a non-discriminatory state choice of law, in an area where national uniformity may not be essential, imposes a burden on interstate commerce in excess of any value attaching to the state's interest in imposing its regulation.
>
> *Aldens, Inc. v. Packel,* 524 F.2d 38, 45–46 (3d Cir.1975) (footnotes omitted). State door-closing statutes fall into category 2(c).[3] *Id.* at 49.

 We recognize, however, that a state-imposed burden on interstate commerce, regardless of its extent, will not violate the Constitution if that burden has been expressly authorized by Congress. *See Lewis v. BT Inv. Managers, Inc.,* 447 U.S. 27, 35–36, 44–45, 100 S.Ct. 2009, 2015, 2019–20, 64 L.Ed.2d 702 (1980). The district court found that section 3103(a) of the International Banking Act of 1978, 12 U.S.C.A. §§ 3101–3108 (the "IBA"), confutes any possible Commerce Clause violation here.· Section 3103(a) provides:

> Except as provided by subsection (b) of this section, (1) no foreign bank may directly or indirectly establish and operate a Federal branch outside of its home State unless (A) its operation is expressly permitted by the state in which it is to be operated ...; (2) no foreign bank may directly or indirectly establish and operate a State branch outside of its home State unless (A) it is approved by the bank regulatory authority of the State in which such branch is to be operated ...; (3) no foreign bank may directly or indirectly establish and operate a Federal agency outside its home State unless its operation is expressly permitted by the State in which it is to be operated; (4) no foreign bank may directly or indirectly establish and operate a State agency or commercial lending company subsidiary outside of its home State, unless its establishment and operation is approved by the bank regulatory authority of the State in which it is to be operated....

12 U.S.C. § 3103(a).

We disagree with the district court's view that this section provides authority for a state "to regulate all banking activity within [it]." *Arab African Int'l Bank v. Epstein,* 1992 WL 184362, *7, 1992 U.S.Dist. LEXIS 11693, *19–20 (D.N.J. July 20, 1992). Clearly, the IBA enables a state to allow or disallow a foreign bank's establishment of branches, agencies or subsidiaries within its borders. That was not what happened here, however. Arab African made only a single loan to a New Jersey partnership to purchase property in New Jersey; it did not seek to establish a federal or state branch or agency or a commercial lending subsidiary there. We do not read the IBA as allowing New Jersey to enforce the Act wholly free of Commerce Clause restraints. "Congress must manifest its unambiguous intent before a federal statute will be read to permit or approve ... a violation of the Commerce Clause...." *Wyoming v. Oklahoma,* —— U.S. ——, ——, 112 S.Ct. 789, 802, 117 L.Ed.2d 1 (1992); *see South–Central Timber*

Jersey. We, too, will not address this argument, as we find it to have been waived.

---

**3.** We note that the Act technically is not a door-closing statute, as that label is usually used to describe statutes in which foreign corporations are barred from access to the state's courts if they have not properly qualified to do business there. In addition to the Act, New Jersey has such a statute. *See* N.J.Stat.Ann. §§ 14A:13–11, 20. The statutes are similar, however, and we find the category 2(c) analysis relevant to both.

*Dev. Inc. v. Wunnicke,* 467 U.S. 82, 94, 104 S.Ct. 2237, 2242, 81 L.Ed.2d 71 (1984). The IBA manifests no such intent.

As an alternative to its determination that no Commerce Clause violation was possible, the district court found that no Commerce Clause violation had occurred because it concluded that New Jersey's "interest in maintaining its comprehensive regulatory scheme substantially outweighs any federal interest in permitting foreign, unlicensed banks from [suing] in New Jersey state courts for claims based on prohibited conduct." *Arab African Int'l Bank,* 1992 WL 184362, *7, 1992 U.S.Dist. LEXIS 11693 at *19. In so holding, the district court did not consider the burden on interstate commerce and therefore did not use the proper standard. Accordingly, we will reverse the grant of summary judgment, and remand the cause to the district court to apply the analysis of *Allenberg Cotton Co. v. Pittman,* 419 U.S. 20, 95 S.Ct. 260, 42 L.Ed.2d 195 (1974) to determine, based on the extent of Arab African's business in New Jersey, whether application of the Act in this case imposes a burden on interstate commerce that outweighs New Jersey's interest in enforcing the Act.

In *Allenberg,* the Supreme Court held that application of a state door-closing statute to a foreign corporation violates the Commerce Clause when the foreigner has only "enter[ed] the State 'to contribute to or to conclude a unitary interstate transaction[,]'" or when its business in the state is not "localized" or of an "intrastate character." *Allenberg,* 419 U.S. at 33–34, 95 S.Ct. at 267. There, a Tennessee cotton merchant sued in a Mississippi court to enforce a forward contract with a Mississippi farmer. The cotton merchant had no office or employees in Mississippi, but solicited contracts with farmers there through an independent broker. Once a contract was obtained, the merchant contracted to resell the cotton in interstate commerce, and these resale contracts were reflected in the prices on a national commodities exchange. The cotton was held in Mississippi only as a prerequisite to its shipment interstate. On these facts, the Supreme Court found that the Mississippi door-closing statute could not constitutionally bar the Tennessee merchant from recourse to the Mississippi courts.

The Second Circuit Court of Appeals reads *Allenberg* as standing for the proposition that "a state 'door closing' statute may not impede a diversity action concerning interstate or foreign commerce...." *In re Grand Bahama Petroleum Co.,* 550 F.2d 1320, 1326 (2d Cir.1977). We find this characterization to be apt. We also agree with the Eleventh Circuit Court of Appeals that "the question of localization calls for an ad hoc inquiry into the facts of each case," and note its helpful suggestion that, in answering this question, consideration should be given to "the permanence and scope of [the] relationships between the foreign corporation and the forum state" and "whether the intrastate transaction is an essential element of an interstate transaction." *S & H Contractors v. A.J. Taft Coal Co.,* 906 F.2d 1507, 1511 (11th Cir.1990), cert. denied, 498 U.S. 1026, 111 S.Ct. 677, 112 L.Ed.2d 669 (1991).

Two other decisions are also helpful. In *Radio WHKW, Inc. v. Yarber,* 838 F.2d 1439 (5th Cir.1988), an Alabama radio station sued a Mississippi resident in a Mississippi court, and, like Allenberg Cotton Company, ran up against Mississippi's door-closing law. The radio station's corporate offices and transmitter were located in Alabama, and most of its production and broadcasting and all of its administrative and management activities occurred there. The station, however, derived its income from selling air time to advertisers, many of whom were Mississippi businesses. In fact, Mississippi advertisers accounted for more than one-half of its advertising revenues.

Accordingly, the station maintained a sales office in Columbus, Mississippi, where it had its largest sales staff. The radio station made purchases from and entered into contracts with Mississippi businesses and citizens to maintain this staff. It also regularly conducted remote promotional broadcasts from Columbus. Focusing on these three facts, the district court found that the station had sufficiently localized its business activities within Mississippi to be subject to the door-closing statute. The Fifth Circuit Court of Appeals, however, disagreed, find-

ing the interstate sales of air time to be inseparable from the intrastate remote broadcasting and sales office activity. Therefore, the station's activities in Mississippi reflected "a pattern of unitary interstate transactions rather than a localized or separable intrastate focus," and the door-closing statute could not be applied. *Id.* at 1445.

By contrast, *S & H Contractors v. A.J. Taft Coal Co.*, 906 F.2d 1507 (11th Cir.1990), *cert. denied,* 498 U.S. 1026, 111 S.Ct. 677, 112 L.Ed.2d 669 (1991), provides an example of localization. There, an Alabama coal company purchased an unassembled machine in interstate commerce. Although the seller agreed to provide several engineers to oversee the process, the coal company was responsible for assembling the machine and contracted with a Kentucky contractor to do so. To complete the assembly—which without delay would take almost a year—the contractor sent four or five part-time employees and one full-time employee to Alabama and leased apartments for them there, transported equipment to the Alabama assembly site, maintained a telephone system in a trailer there and hired union employees to assist with the job. Under these circumstances, the Eleventh Circuit Court of Appeals found the contractor's operations to be sufficiently localized in Alabama to enforce Alabama's door-closing statute against it. *Id.* at 1512. Moreover, since the coal company could have performed the assembly itself and did not seek out or enter into the contract with the Kentucky contractor until after it had purchased the machine, the assembly contract was not essential to the machine's interstate sale. *Id.* at 1513.

As these cases make clear, this analysis is fact-intensive. We cannot assess the extent of Arab African's business in New Jersey; rather, the district court's expertise is required. Hence, we will remand for the district court to analyze whether under *Allenberg* the New Jersey Act imposes a burden

on interstate commerce that outweighs New Jersey's interest in enforcing its Act.[4]

## C.

▮ When it moved to reargue the summary judgment, Arab African also sought leave to amend its complaint to assert a RICO claim against the Epstein defendants. The district court denied leave because amending would be futile since the proposed claim was time-barred. The district court properly exercised its discretion in so ruling, and we will affirm.[5]

▮ The grant or denial of leave to amend is a matter committed to the sound discretion of the district court. Amendment may be denied on the grounds of "undue delay, bad faith or dilatory motive on the part of the movant, ... undue prejudice to the opposing party ..., [or] futility of amendment...." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). We cannot say that the district court abused its discretion in finding that amendment would be futile here.

▮ Civil RICO claims are subject to a four-year statute of limitations. *Agency Holding Corp. v. Malley–Duff & Assocs.,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). This period generally runs "from the date the plaintiff knew or should have known that the elements of a civil RICO cause of action existed...." *Keystone Ins. Co. v. Houghton,* 863 F.2d 1125, 1126 (3d Cir.1988). If, however, "as part of the same pattern of racketeering activity there is further injury to the plaintiff or further predicate acts occur which are part of the same pattern," it runs "from the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering activity." *Id.*

Arab African's RICO claim is premised on its allegations that, during the negotiation and closing of the Sencit–Arab African deal, the Epstein defendants used the mails and the telephones to fraudulently induce it to

---

**4.** On remand, the district court is directed to notify the Attorney General of New Jersey so that he may enter an appearance and defend the New Jersey statute.

**5.** In light of the posture in which this issue arose, we have no occasion to consider whether the proposed amendment raises a viable RICO claim.

make an unenforceable loan in New Jersey. The proposed RICO count acknowledges that the fraudulent scheme ended in 1986, the year of the foreclosure action; Arab African has alleged neither further injury nor predicate acts thereafter. Nevertheless, Arab African argues that it was not until July 1992, when it received discovery responses from the Epstein defendants, including a list of correspondence and drafts of the opinion letter and loan documents, that it discovered that defendants had used the mails and the telephones to further their scheme. Therefore, it asserts that the RICO limitations period should run from that date.

The district court rejected this argument, finding that Arab African should have known of the alleged phone and mail use, at the latest, on the date the New Jersey Superior Court issued its oral opinion in the foreclosure action, or by May 5, 1986. This finding is amply supported by the record. Based on the evidence at trial, the judge described the relevant dealings between the parties as follows:

> [M]eetings in New York City ultimately resulted in an agreement between the parties that a loan would be made.... The negotiations continued and attorneys were called in to participate in the negotiations and in the preparation of documents. Jonathan Epstein, a member of the bar of the State of New Jersey[,] represented the Defendant, Sencit. And the bank retained the services of Sherman Kendis, a member of the bar of the State of New Jersey, to represent its interest in this matter. Various discussions between Mr. Epstein and Mr. Kendis took place. Various drafts of documents were prepared by Mr. Epstein and reviewed by Mr. Kendis in New Jersey and by the bank in New York. Various drafts of opinion letters were prepared by Mr. Epstein, reviewed by Mr. Kendis, and I believe a draft of an opinion letter or an opinion letter was prepared by Mr. Kendis....

We find no error in the district court's finding that by then, Arab African reasonably should have known that the mails and the telephones had been used by the Epstein defendants in their alleged fraud, and in its conclusions that the claim was time-barred and, hence, amending the complaint would be futile.

### D.

Although it denied Arab African leave to amend the complaint, the district court found no basis for imposing Rule 11 sanctions on Arab African for trying. Because we find the district court properly exercised its discretion in so ruling, we will affirm.

We have repeatedly said that Rule 11 sanctions are reserved for circumstances where a claim or motion is "patently unmeritorious or frivolous." *Doering v. Union County Bd. of Chosen Freeholders*, 857 F.2d 191, 194 (3d Cir.1988); *see Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 483 (3d Cir.1987). In its deliberations, a court must inquire into "what was reasonable to believe at the time the pleading, motion or other paper was submitted." Notes of Advisory Committee on Rules, 1983 Amendment, Fed.R.Civ.P. 11.

The district court determined that Arab African had a reasonable basis for filing its motion. We see no reason to disturb this finding. The court denied the motion, but that alone is not enough to support sanctions. Rule 11 sanctions are never appropriate when a party's "only sin was being ... unsuccessful ..." *Gaiardo*, 835 F.2d at 483. Accordingly, the denial of Rule 11 sanctions will be affirmed.

### III.

In sum, we conclude that the district court erred by granting summary judgment for the Epstein defendants and will reverse and remand the cause for further proceedings. We will affirm the district court's denial of leave to amend the complaint and of Rule 11 sanctions.